**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John P. McGUIRE, Defendant–**
**Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Cherlyn Petersen, Defendant–Appellant.**

**Nos. 99–30165, 99–30166.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 2002.

Filed Oct. 11, 2002.

---

Edmund F. Sheehy, Jr., Cannon & Sheehy, Helena, MO, for defendant-appellant John Patrick McGuire.

Brian K. Kohn, Billings, MO, for defendant-appellant Cherlyn Petersen.

George Z. Toscas (argued), Terrorism and Violent Crime Section, Crim. Div., U.S. DOJ, William Mercer, U.S. Atty., Dist. of Montana, James E. Seykora, Asst. U.S. Atty, Dist. of Montana, Patty Merkamp Stemler, Robertson T. Park and David S. Kris, Department of Justice, Washington, DC, for the plaintiff-appellee.

Before HAWKINS, GOULD, Circuit Judges, and WARE, District Judge.*

* The Honorable James Ware, United States District Judge for the Northern District of

## OPINION

GOULD, Circuit Judge.

Defendants–Appellants John P. McGuire and Cherlyn Petersen were members of a group known as the Montana Freemen. They were convicted of bank fraud for participating in a scheme that involved printing bogus checks on a home computer and trying to exchange them for real currency. Petersen asserts that wiretapping conducted by the FBI during its investigation violated the federal wiretap statute because wiretapping was not "necessary" and because agents did not follow adequate minimization procedures during their interception of facsimile transmissions. McGuire asserts that the wiretap recordings were improperly sealed. He challenges the district court's decision to admit a witness's prior testimony when the witness was seven months pregnant and had a note from her doctor stating that the pregnancy prevented the witness from testifying. McGuire also asserts ineffective assistance of trial counsel. We affirm.

### I

McGuire and Petersen were members of a group called the "Montana Freemen," which was hostile to the United States government. The Freemen attempted to establish their own government and financial system. To this end, they printed and distributed thousands of fraudulent financial instruments. The Freemen wrote more than 3300 checks that purported to be worth more than $15 billion but that drew on bank accounts with little or no cash. They distributed these checks widely and used them to overpay debts, cashing or depositing any refund received. The Freemen also held classes to teach others their fraudulent techniques. The classes were conducted at the "schoolhouse," a building located on rural Montana property owned by two of the Freemen and referred to as "Justus Township." The district court that convicted the Freemen described the group's activities as "an unusually large and complex criminal scheme" involving hundreds of persons and millions of dollars in losses.

McGuire participated in the fraud by using Freemen financial instruments to purchase various goods and services. Twenty-two fraudulent checks were made out to him, including several presented for payment of debts and used to buy merchandise from L.L. Bean. McGuire also was convicted of robbery for taking sound recording equipment from a three-person ABC news television crew that had come to Justus Township to interview the Freemen. Petersen participated in the fraud by attempting to deposit unfunded Freemen checks.

Although many of the Freemen's crimes were transactional in nature, the Federal Bureau of Investigation (FBI) had reason to believe the group was capable of violence. The group members were known to possess a large number of firearms, including hunting and assault weapons. Many of them had been seen wearing sidearms at Justus Township. One group member had threatened a local sheriff, telling him the sheriff would be hanged and thrown off a bridge. Other group members had threatened to kidnap, assault, and murder a United States district judge. They had sent the judge and other public officials a letter stating, "Our special Orders ... is for our special appointed Constables and our Lawful Posse to *shoot to kill any public hireling or fourteenth ammendment[sic] citizen* who is caught in any act whatsoever of taking Private property."

When the FBI began investigating the Freemen, we appointed a United States

California, sitting by designation.

District Judge from the District of Oregon to supervise the FBI's wiretapping, pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2521. We appointed a judge from outside the District of Montana because all of the federal judges there recused themselves or were in ill health.[1]

Based on FBI affidavits, the United States District Judge whom we had appointed approved the FBI's requests to conduct phone and fax wiretapping on Freemen properties, and he later approved placing a microphone on the premises to record conversations. Because the judge had his chambers in Oregon and was often outside the District of Montana, he issued several orders authorizing the FBI to postpone sealing the recordings as required by statute.

The FBI arrested two Freemen on March 25, 1996. The remaining Freemen, including McGuire and Petersen, engaged in an 81–day standoff with state and federal officials. The standoff ended without violence on June 13, 1996.

A first trial resulted in a hung jury. Before retrial, the doctor for one of the ABC news crew robbery victims wrote to the court to say that the victim would be unable to travel to Montana for the trial and would be unable to testify by video because of her pregnancy. Over McGuire's objection, the district court allowed the victim's videotaped testimony from the first trial to be admitted. A jury convicted McGuire of bank fraud, robbery, and four firearms violations, and he was sentenced to 180 months imprisonment. Petersen was convicted on two counts of

bank fraud and one count of mail fraud. She was sentenced to time served and five years of supervised release.

## II

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, permits law enforcement officials to engage in electronic surveillance if certain privacy safeguards are observed. The defendants allege that the FBI failed to heed three required safeguards: that wiretapping be "necessary," that the government "minimize" interception of communications not pertinent to the criminal investigation, and that intercepted communications be "sealed" immediately.

### A. Necessity

■ An application for a court-authorized wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). It must recite facts indicating that "normal investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c). This "necessity" requirement can be satisfied by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case. *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir.1986). We have said that the wiretap should not ordinarily be the initial step in the investigation,[2] but that law enforcement officials

---

**1.** Judge Battin was suffering from terminal cancer and spent only a limited amount of time attending to his caseload. Judge Hatfield had been targeted by the Freemen fraud scheme, and he maintained his chambers in Great Falls, an inconvenient 219 miles from the courthouse in Billings. And Judge Shan-

strom—whose life had been threatened by the Freemen—recused himself from the case.

**2.** We do not rule out the possibility that in extraordinary circumstances it is permissible for law enforcement to use wiretap procedures at the outset of an investigation.

need not exhaust every conceivable alternative before obtaining a wiretap. *Id.*

The court authorizing a wiretap has considerable discretion, *United States v. Martin,* 599 F.2d 880, 886–87 (9th Cir.), *cert. denied,* 441 U.S. 962, 99 S.Ct. 2408, 60 L.Ed.2d 1067 (1979), so the standard of review is deferential. *Brone,* 792 F.2d at 1506. Although we review de novo whether the application for wiretapping was submitted in compliance with 18 U.S.C. § 2518(1)(c), we review the issuing court's decision that the wiretaps were necessary for an abuse of discretion. *Brone,* 792 F.2d at 1506.

In this case, the issuing judge did not abuse his discretion in finding that the affidavit in support of the initial wiretap met the statutory requirement of "necessity." The FBI's forty-page affidavit presented an elaborate and convincing explanation of the need to intercept telephone and fax communications. FBI agents could not have conducted on-site surveillance of the Freemen property because of its remote, rural location and group members' alertness to law enforcement activities, which created grave dangers. Agents also would have faced risks in executing any search warrant at the compound, because of the group's known violent propensity and undisputed possession of assault weapons. Federal agents would have had difficulty infiltrating the group with FBI informants, as a result of the Montana Freemen's close-knit nature. Interviewing witnesses would have helped little, as the only persons knowledgeable about the content of the defendants' transactions were the defendants themselves, and the defendants had limited incentive to cooperate. Although three witnesses were cooperating with the FBI when it applied for wiretapping authority, those witnesses were able to give agents only limited information, not including the names of all members of the conspiracy. Moreover, the most valuable evidence in this case seemed likely to be direct evidence of the illicit transactions that took place via telephone and fax. Finally, without the intelligence they gained by wiretapping, FBI agents would have faced great difficulties and dangers in making a plan to locate and safely to apprehend the many armed criminal suspects residing on a potentially dangerous parcel of unfamiliar real estate. It was necessary to wiretap to avoid jeopardizing the lives of the agents, the suspects, and the general public.

Just as important as these practical considerations, however, was the nature of the entity the government was investigating. The law has long recognized that conspiracies pose a greater threat to society than individual action toward the same end. *See, e.g.,* Rollin M. Perkins, Criminal Law 535 (1957). As Justice Felix Frankfurter observed for the Supreme Court,

> Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish. Nor is the danger of a conspiratorial group limited to the particular end toward which it has embarked. Combination in crime makes more likely the commission of crimes unrelated to the original purpose for which the group was formed.

*Callanan v. United States,* 364 U.S. 587, 593–94, 81 S.Ct. 321, 5 L.Ed.2d 312 (1961).

Conspiracies pose other special dangers. Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. Like the Hydra of Greek mythology, the conspiracy

may survive the destruction of its parts unless the conspiracy is completely destroyed. For even if some or many conspirators are imprisoned, others may remain at large, free to recruit others eager to break the law and to pursue the conspiracy's illegal ends. Reflecting this concern, we have "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir.1990). Because the government has a duty to extirpate conspiracy[3] beyond its duty to prevent the mere commission of specific substantive offenses, *Developments in the Law—Criminal Conspiracy*, 72 Harv. L.Rev. 922, 925 (1959), we conclude that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy.

These considerations have even more force when the conspiracy aims to accomplish not just garden-variety street crimes but the overthrow of our government and social order, and when the conspirators are armed with deadly weapons and have trained and practiced in the deadly arts. Just as the punishment should fit the crime,[4] so too the rigor of the government's investigation should fit the threat posed to society by criminals' illicit and coordinated plans. The principle we announce here—that government has considerable latitude to wiretap suspected members of a criminal conspiracy (particularly when the conspirators are bent on the government's destruction)—reflects a larger principle of proportionality embodied in the wiretapping statute: The more grave the threat posed to our society, the greater the government's leeway in pursuing it. *Cf. Scott v. United States*, 436 U.S. 128, 140, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978) (noting that more extensive surveillance may be justified when the investigation is focusing on what is thought to be a widespread conspiracy). The threat posed by the Montana Freemen was grave, so the FBI was entitled to ample leeway to investigate it. Reviewing the factual allegations in the wiretap application as a whole, and in a commonsense fashion, *Brone*, 792 F.2d at 1506, we conclude that the issuing judge did not abuse his discretion in finding that the affidavit demonstrated that normal investigative procedures appeared to be unlikely to succeed if tried.[5]

■ Despite the ample evidence of necessity that we have discussed, Petersen contends that electronic surveillance was not necessary because the government already had obtained indictments without the surveillance. But this is a weak argument, for it is plain beyond doubt that the existence of an indictment does not make wiretapping unnecessary. We held in *Brone* that a wiretap can be necessary if it gives the government the ability to "develop an effective case." 792 F.2d at 1506. By "an effective case," we meant evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment. That there has been an indictment does not mean that a wiretap cannot gain evidence to make a prosecution more effective. In addition, indictments had

---

**3.** This appears to be a persistent challenge to civilized societies. As has been well said, "It is one of the first duties of every government to extirpate gangs of thieves." 4 Thomas Babington Macaulay, *History of England* 205 (1855).

**4.** *See Solem v. Helm*, 463 U.S. 277, 284–86, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (citing sources beginning with the Magna Carta).

**5.** Furthermore, the FBI's initial affidavit, as supplemented by reported developments, justified the judge's subsequent extensions of the FBI's wiretapping authority.

been issued for only a few Freemen defendants, and no indictment had issued for Petersen. The government's possession of evidence sufficient to indict some conspirators does not bar it from seeking evidence against others. Finally, as we have discussed, there was a powerful government interest in identifying all conspirators and the full scope of the conspiracy.

Petersen also argues that there was no need for surveillance because the FBI had infiltrated the conspiracy using informants and undercover agents. This argument misses the mark for several reasons: The wiretapping application explained the limitations of the government informants, that the informants were fearful of their lives and would not be able to identify all the members of the conspiracy. (In fact, the informants had to be removed from Justus Township at one point because the FBI was concerned for their safety.) Not only common sense but also our precedent confirms that the existence of informants and undercover agents does not preclude a necessity finding. In *Brone,* as one example, we upheld a necessity finding in a case with five confidential informants and an undercover agent. 792 F.2d at 1506. The Montana Freemen conspiracy was widespread and dangerous. Infiltration alone could not determine the scope of it. Standard law enforcement techniques alone could not effectively crack the conspiracy, exposing its illicit aims and acts.

The district court did not abuse its discretion in finding that the electronic surveillance was necessary.

### B. Minimization

Title III requires that wiretapping or electronic surveillance "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5); *Scott,* 436 U.S. at 130, 98 S.Ct. 1717. Petersen argues that the FBI did not follow proper minimization techniques during its interception of the Freemen's fax transmissions. We have not heretofore addressed the specific question of what minimization procedures are required for fax interceptions.[6]

Nonetheless, the general requirements of the wiretap law, as explained by controlling precedent, are clear. Minimization requires that the government adopt reasonable measures to reduce to a practical minimum the interception of conversations unrelated to the criminal activity under investigation while permitting the government to pursue legitimate investigation. *Torres,* 908 F.2d at 1423; *United States v. Santora,* 600 F.2d 1317, 1320 (9th Cir.1979) (amended on other grounds). The United States Supreme Court has stressed that, because of the necessarily ad hoc nature of any determination of reasonableness, there can be no inflexible rule of law that will decide every case. *Scott,* 436 U.S. at 139, 98 S.Ct. 1717. Instead, the question whether the government complied with the statutory requirement to minimize surveillance by wiretap requires examination of the monitoring officers' conduct in light of the particular circum-

---

6. When Congress established Title III as part of the Safe Streets and Omnibus Crime Act of 1968, it intended to restrict the interception of communications such as telephone and live, person-to-person conversations. There was no indication that Congress considered protecting nascent communications media such as faxes or e-mail. Partly in response to a federal district court's decision that Title III did not apply to telexes, *see United States v.*

*Gregg,* 629 F.Supp. 958 (W.D.Mo.1986), Congress passed the Electronic Communications Privacy Act of 1986 (ECPA) to increase the types of communications protected. Under the ECPA, electronic communications joined wire and oral communications as protected types of communication. The definition of "intercept" was broadened to include the "aural *or other*" acquisition of a communication. 18 U.S.C. § 2510(4).

stances of the case. *Id.* at 140, 98 S.Ct. 1717; *United States v. Homick,* 964 F.2d 899, 903 (9th Cir.1992).[7]

Here, the district court's order authorizing the FBI to intercept the Freemen faxes explicitly required that the agents use what the district court thought were reasonable minimization techniques:

Each facsimile transmission will be printed on the machine used to intercept facsimile transmissions. The monitoring agent and [assistant United States attorney] will decide, based on the identities of the sender and recipient and the subject matter of the transmission, whether the facsimile appears to be pertinent to the criminal offenses listed in the court's order. If the facsimile does not appear to be pertinent, the intercepted transmission will be placed in an envelope and sealed. It will then be placed in a locked drawer until it is turned over to the court with the other intercepted transmissions after the interception order has expired.

It is not clear from the record whether government officials read non-pertinent faxes in their entirety.[8] But even assuming the officials read all the faxes in their entirety, their conduct cannot be considered unreasonable on that ground alone.

We reach this conclusion because the Supreme Court has approved government wiretapping even when the officials intercepted virtually all communications taking place on a particular telephone line. In *Scott,* a district court had authorized government officials to intercept calls to a telephone used in a conspiracy to import and distribute narcotics in the Washington,

D.C., area. 436 U.S. at 130–31, 98 S.Ct. 1717. Over the next month, government agents intercepted virtually all of the calls made from that telephone, even though only forty percent of the calls were narcotics-related. *Id.* at 132, 98 S.Ct. 1717. The government's conduct, the Supreme Court held, was not unreasonable under the circumstances:

[W]hen the investigation is focusing on what is thought to be a widespread conspiracy[,] more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more of the conversations will be permissibly interceptible because they will involve one or more of the co-conspirators.

436 U.S. at 140, 98 S.Ct. 1717. In cases of "wide-ranging conspiracy," the Court explained, "even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Id.* at 142, 98 S.Ct. 1717. It was therefore not unreasonable to listen to all the calls. *Id.* at 143, 98 S.Ct. 1717.

■ A comparison of the facts here with the facts in the Supreme Court's *Scott* decision demonstrates that the FBI's minimization techniques were not unreasonable. As in *Scott,* the government in this case was investigating a widespread conspiracy. More than a dozen people were indicted, and there were many additional unindicted co-conspirators. *Compare Scott,* 436 U.S. at 132, 98 S.Ct. 1717 (fourteen people indicted). As the district court noted in a pretrial order, the government's investigation concerned "an unusu-

---

7. A district court's conclusion that the government followed adequate minimization techniques is reviewed de novo. *Torres,* 908 F.2d at 1423.

8. Based on the language of the order (and Petersen does not dispute that the officers

abided by the order's requirements), the officers may have performed only a cursory examination of fax transmissions to determine whether the faxes "appear[ed]" to be pertinent.

ally large and complex criminal scheme" involving millions of dollars and hundreds of persons. Because the scheme involved so many people, government officials were entitled to considerable latitude in intercepting communications so that they could attempt to determine the precise scope of this dangerous enterprise. And because of the extent and complexity of the defendants' crimes, and the conspiracy's hostility to outsiders, officials were entitled to scrutinize the defendants' communications with exceptional care. Among the incriminating documents the FBI intercepted were maps, instructions on how to commit fraud, documents purporting to be negotiable instruments, and warnings by various financial institutions. The diversity and technical nature of these documents justified officials' taking extra care to separate the relevant from the irrelevant, even if it meant that they read some non-pertinent materials. Officials could hardly be expected to know which faxes were not pertinent without examining them in some detail.

This conclusion is reinforced by the fact that unlawful conspiracies do not always lay bare their plans in explicit words. Law enforcement is entitled to latitude to scrutinize messages by conspirators, because such messages may contain double-meanings and implied purposes, or even be conveyed in secret code. We decline to adopt a rule that would require law enforcement to review conspirators' communications with a blind eye.

Another factor weighing in favor of the reasonableness of the FBI's minimization procedure is the effort the agency made to protect the defendants' privacy. Faxes that did not appear to be pertinent were placed into an envelope and sealed. These were then placed in a locked drawer. Although this procedure did not prevent the monitoring agent and the assistant United States attorney from reading the documents as part of their preliminary screening, it ensured that other people—government agents, lawyers, and others—did not read the non-pertinent documents at all. Moreover, the procedure ensured that the monitoring agent and the assistant United States Attorney read the documents only once.[9] When government agents are investigating a conspiracy of this size and complexity, the ECPA and Title III require nothing more. *See Torres*, 908 F.2d at 1424 (holding that when wire interceptions concern a drug ring "the need to allow latitude to monitoring agents is paramount").

Petersen argues that the FBI should have taken even greater care to minimize interception of non-pertinent documents. Specifically, she argues that the FBI should have taken steps similar to the steps law enforcement officials typically take when they intercept oral communications. When officials conduct a telephone wiretap to intercept oral conversations, they typically stop listening once it seems that the conversation is not pertinent to the criminal investigation. After some time passes, typically thirty seconds to two minutes, the officials again will listen to determine whether the conversation has

---

9. Lest we be misunderstood, we do not here endorse the principle that intercepted communications may be perused only once. To the contrary, there may be cases where data that appears innocent in isolation will appear culpable in context. Investigating a conspiracy is like putting together a jigsaw puzzle. The picture of danger may not always reveal itself in individual pieces. Often, it is only when all the pieces are assembled that officials can see the full picture. The wiretapping statute gives officials flexibility when flexibility is needed. In view of the minimization techniques adopted here, however, we have no occasion to review the reasonableness of less rigorous minimization techniques than those that were adopted.

shifted to matters pertinent to the investigation. Reasoning by analogy, Petersen argues that the officers in this case should have looked at each fax transmission with a ruler in hand, reading line by line. She argues that once it became apparent that language in a fax was not pertinent, the officials should have skipped about thirty lines and then continued reading, line by line, until they reached the end of the transmission. Only in this way, Petersen argues, can the minimization procedures for fax interceptions mimic those used for oral conversation interceptions.

But, for the reasons stated above, the ECPA and Title III do not require so much in these circumstances. Because many, including persons unknown, were involved in this conspiracy, it would not necessarily be clear from the names of the sender and the recipient whether a particular document was pertinent. And because of the unusual nature of the documents the defendants received (tables, photographs, maps, and other graphic material, in addition to letters and negotiable instruments), it also might not necessarily be clear from a particular, randomly selected line that a document (or even a portion of a document) was not pertinent. As the district court declared, the minimization techniques used by the FBI might not have been optimal. But they do not need to be optimal, only reasonable, and reasonable they were.

Our conclusion that the government's minimization procedures were adequate under the circumstances is supported by the legislative history of the ECPA. The Senate Judiciary Committee gave some guidance on minimization in the computer age:

> It is impossible to "listen" to a computer and determine when to stop listening and minimize as it is possible to do in listening to a telephone conversation. For instance, a page displayed on a screen during a computer transmission might have five paragraphs of which the second and third are relevant to the investigation and the others are not. The printing technology is such that the whole page including the irrelevant paragraphs, would have to be printed and read, before anything can be done about minimization.
>
> Thus, minimization for computer transmissions would require a somewhat different procedure than that used to minimize a telephone call. Common sense would dictate, and it is the Committee's intention, that the minimization should be conducted by the initial law enforcement officials who review the transcript. Those officials would delete all nonrelevant materials and disseminate to other officials only that information which is relevant to the investigation.

S.Rep. No. 99–541, at 30–31 (1986). We interpret Congress's "common sense" idea of electronic minimization to mean that law enforcement in some circumstances may look at every communication. Congress intended that the pool of investigative material be filtered. Here the district court established a reasonable procedure to eliminate irrelevant information. Under the circumstances, that is all the ECPA and Title III require.

### C. Sealing

 Title III specifies procedures for storing intercepted communications after the government ends its surveillance. The statute states, "[i]mmediately upon the expiration of the period of the order [authorizing wiretapping], or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." 18 U.S.C. § 2518(8)(a). The government must follow these procedures or it cannot use the intercepted communications against the surveilled individual in a crimi-

nal trial. To use wiretap evidence, the government must (1) seal the tapes immediately or (2) provide a "satisfactory explanation" for the delay in obtaining a seal. *United States v. Pedroni,* 958 F.2d 262, 265 (9th Cir.1992). McGuire argues that the recordings were not sealed "immediately" upon the expiration of the order authorizing wiretapping and that there was no satisfactory explanation for the delay. The district court's determination that the government did not violate Title III is reviewed de novo. *Pedroni,* 958 F.2d at 265.

It is uncertain whether there were delays in sealing most of the wiretap recordings in this case, within the meaning of the statute. If we merely count the days between the expiration of the authorized recording period and the date of final sealing, then there were delays. For example, the FBI was authorized to wiretap telephone lines at the "Schoolhouse" (Line 42) and the Ralph Clark Trailer (Lines 43 and 44) until April 21, 1996, (thirty days after the granting of the March 22, 1996, extension). Final sealing of those recordings did not occur until May 3, 1996, twelve days later. Based on similar calculations, there was a three-day delay before sealing some of the microphone recordings made within Justus Township (Lines 45, 46, and 47), a 124–day delay before sealing the first wiretap recordings made on Line 44, and a 127–day delay before sealing the first electronic recordings of Line 44.

But "delay" could be measured differently. Before the end of the authorized wiretapping period, the FBI requested that the court direct that final sealing of recordings be postponed until the judge

returned to the District of Montana. The issuing court expressly approved the government's postponing final sealing. So, for example, in the case of the wiretapping at the Schoolhouse and the Ralph Clark Trailer that was authorized to continue until April 21, 1996, the court on March 25, 1996, directed that sealing be postponed. Thus, the court ordered a postponement of sealing twenty seven days *before* the end of the authorized period. It is arguable that such an explicit postponement, pursuant to court order, tolls the end of the period in which sealing must occur or otherwise amounts to a de facto sealing. Title III directs that recordings shall be "sealed *under [the issuing court's] directions.*" 18 U.S.C. § 2518(8)(a) (emphasis added). When the issuing court, before the end of the authorized wiretapping period, or immediately upon the expiration of that period (or extensions thereof), *directs* that final sealing shall occur in the future, and the government complies with that direction, it may be that there is no delay in sealing, that sealing occurred at the time of the order, "under [the issuing court's] directions" within the meaning of Title III.[10] The purpose of the statute, that recorded confidences be handled under direction of the court, is served by such a procedure.

■ We need not decide, however, whether a court order directing that final sealing shall occur in the future amounts to a "sealing" under the statute. Assuming that the delays in this case were three, twelve, one-hundred twenty-four, and one-hundred twenty-seven days, we hold that the government has provided a "satisfacto-

10. Under this principle, there would be no delay before the sealing of most of the government's wiretap recordings. One wiretap of the Ralph Clark Trailer at Justus Township (Line 44) was authorized to continue until December 31, 1995; the issuing court ordered postponement of sealing on December 29, 1995 (two days early). Another wiretap of the same telephone line was authorized to continue until January 28, 1996; the issuing court ordered postponement of sealing on January 26, 1996(two days early). There would be no "delay" in sealing any of these recordings under Title III.

ry explanation" for the delay in obtaining a seal.[11]

We have noted that immediately sealing the tapes means "within one or two days," and that "any delay beyond that certainly calls for explanation." *Pedroni,* 958 F.2d at 265. If the tapes were not sealed immediately in this case, the government must offer a satisfactory explanation to prevent the tapes' exclusion from evidence at trial. The Supreme Court interpreted the § 2518(8)(a) suppression provision in *United States v. Ojeda Rios,* 495 U.S. 257, 110 S.Ct. 1845, 109 L.Ed.2d 224 (1990). The Court concluded that the " 'satisfactory explanation' language in § 2518(8)(a) must be understood to require that the Government explain not only why a delay occurred but also why it is excusable." *Id.* at 265, 110 S.Ct. 1845.

■ The government bases its "satisfactory explanation" in this case on several facts, each of which bears substantial weight. First is the fact that we appointed an out-of-district judge—Judge James M. Burns of the District of Oregon—to supervise the wiretapping, because otherwise available federal judges in the District of Montana were recused as a result of prior bad experiences with the Freemen. That Judge Burns sits in Oregon, rather than Montana, explains many of the delays.[12] As we have noted, "[t]he unavailability of the issuing or supervising judge may constitute a satisfactory explanation for a sealing delay." *Pedroni,* 958 F.2d at 266.

A second fact that weighs in favor of the agency is that it took special precautions to safeguard the recordings pending judicial sealing. Officials physically sealed the recordings in envelopes at the end of each day, and then placed the envelopes in a safe to which only three supervising FBI agents had the combination. Such careful procedures are significant. *Id.* at 265–66.

Third, though the length of the sealing delay is not dispositive, *Pedroni,* 958 F.2d at 266, courts have admitted evidence even where the delay was almost as long as most of the delays (if any) here. *See United States v. Mora,* 821 F.2d 860, 870 (1st Cir.1987) (delays of twenty and forty-one days); *United States v. Diana,* 605 F.2d 1307, 1315 (4th Cir.1979) (delay of thirty-nine days), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980); *United States v. Lawson,* 545 F.2d 557, 564 (7th Cir.1975) (delay of fifty-seven days), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976).

■ Fourth, and perhaps most importantly, Judge Burns by written order postponed the sealing of the recordings until he could supervise. Three times, Judge Burns ordered the FBI to "maintain all tapes and appropriate material relating to the intercepts" until he returned to Montana to supervise sealing. When the government acts pursuant to a court's order postponing sealing, this factor is entitled to great weight in assessing whether the government has demonstrated a "satisfactory explanation" for any delay that might result.

In light of all of the above reasons, we have no doubt that any delay that occurred in this case was justified by the exigent circumstances and that the government gave a satisfactory explanation. We hold

11. Wiretaps of the two telephone lines at the Skurdal Cabin (Lines 39 and 40) and a microphone there (Line 41) were authorized to continue until October 21, 1995; the recordings therefrom were finally sealed on October 11, 1995. Sealing of these recordings was not delayed however delay is calculated.

12. Although Senior U.S. District Court Judge James F. Battin, from the District of Montana, sealed recordings on one occasion at the request of Judge Burns, Judge Battin was not normally available because of a serious and regrettably terminal illness.

that the FBI in this case thus did not violate Title III's prompt sealing requirement and that the sealing requirement poses no barrier to the admissibility of the challenged wiretap evidence.

## III

The Federal Rules of Evidence prohibit the admission of hearsay statements except under certain specified circumstances. Fed.R.Evid. 802. One of those circumstances is the "former testimony" hearsay exception of Rule 804(b)(1), which allows admission of a witness's testimony given at a prior hearing "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." The 804(b)(1) exception to the hearsay rule does not apply, however, unless the witness is "unavailable" under Rule 804(a).

McGuire challenges the district court's decision to permit the introduction of former testimony by ABC news producer Alison Sesnon, a victim of McGuire's robbery. McGuire argues the court erred in finding that the witness's pregnancy, as described by her doctor, made her "unavailable" within the meaning of Rule 804(a). We review for an abuse of discretion. *United States v. Manning*, 56 F.3d 1188, 1196(9th Cir.1995).

Under Rule 804(a)(4), a witness is unavailable if she "is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." In determining whether a witness is unavailable under this rule, courts have considered factors such as the nature of the infirmity, the expected time of recovery, the reliability of the evidence concerning the infirmity, and other special circumstances. *See, e.g., Ecker v. Scott*, 69 F.3d 69, 72(5th Cir.1995).

It was not inappropriate for the district court to have credited Sesnon's doctor's written opinion that Sesnon's pregnancy (she was twenty-eight weeks pregnant) made her unable to undergo the stresses of testimony. There is nothing wrong with a district court's relying on a physician's statement when assessing availability. A pregnancy in its seventh month poses special risks for a mother and her unborn child that may be exacerbated by the stress of trial. These risks in late pregnancy, when attested to by a physician, are an "infirmity" within the meaning of the Rule. In addition, had Sesnon carried her child to term before testifying, she would have been pregnant—and presumably unable to testify—for at least another eight weeks. In the past, we have deemed a witness "unavailable" when medical necessity rendered the witness unable to testify for a far shorter, one- to two-week period. *See Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 713 (9th Cir.1992). And there is no reason to doubt the reliability of the evidence concerning her infirmity. Finally, the trial in this case involved scores of witnesses (many of whom were required to travel long distances to the trial), ten defense attorneys, and a judge from another judicial district sitting by designation. The district judge's decision to adhere to the trial date to accommodate so many competing schedules was not improper. The district court was well within its discretion in determining that Sesnon was unavailable under Rule 804(a)(4).

## IV

McGuire alleges that he was denied effective assistance of counsel because his attorney did not adequately "investigate" the consequences of McGuire's decision to testify at his trial. This claim is premature, and we decline to address it at this juncture. *See United States v. Karterman*, 60 F.3d 576, 579 (9th Cir.1995) (noting that appeals courts generally review

ineffective assistance claims through habeas corpus proceedings, where the record has been more fully developed); *United States v. Swanson,* 943 F.2d 1070, 1072 (9th Cir.1991) (same). Development of the record is needed as to what "investigation" counsel conducted and whether counsel adequately advised McGuire of the risks of testifying.

**AFFIRMED.**