**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. ERNIE LEO ESTRADA, AKA Youngster, *Defendant-Appellant.* | No. 16-50439 D.C. No. 5:14-cr-00107-VAP-44 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. MARK ANTHONY RIOS, AKA Sharky, *Defendant-Appellant.* | No. 16-50492 D.C. No. 5:14-cr-00107-VAP-14 OPINION |

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief Judge, Presiding

Argued and Submitted July 10, 2018
Pasadena, California

Filed September 18, 2018

Before:  Marsha S. Berzon and N. Randy Smith, Circuit Judges, and P. Kevin Castel,[*] District Judge.

Opinion by Judge N. R. Smith

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's order denying a motion by two defendants to suppress incriminating statements intercepted by government wiretaps.

The panel held that the affidavits submitted by the FBI in support of the wiretap authorization were reasonably detailed, and did not contain a material misstatement or omission.

The panel also held that the district court did not abuse its discretion in determining that the wiretaps were necessary. The panel wrote that it was not illogical or implausible to conclude that the possibility of using a high-level confidential informant was unlikely to result in the successful prosecution of every member of the conspiracy.

---

[*] The Honorable P. Kevin Castel, United States District Judge for the Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Jay L. Lichtman (argued), Los Angeles, California, for Defendant-Appellant Ernie Leo Estrada.

William S. Harris (argued), Law Offices of Wm. S. Harris, South Pasadena, California, for Defendant-Appellant Mark Anthony Rios.

Elana Shavit Artson (argued) and Nathanial B. Walker, Assistant United States Attorneys; Lawrence S. Middleton, Chief, Criminal Division; Nicola T. Hanna, United States Attorney; United States Attorney's Office, Los Angeles, California; for Plaintiff-Appellee.

## OPINION

N.R. SMITH, Circuit Judge:

Ernie Estrada and Mark Rios ("Defendants") challenge the validity of a wiretap authorized by the district court.[1] We affirm the district court's order denying Defendants' motion to suppress.

To obtain a wiretap, the government must submit an affidavit containing inter alia "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). Here, the affidavits submitted by the Federal

---

[1] The district court that presided over Defendants' criminal cases is the same district court that initially authorized the wiretaps.

Bureau of Investigation ("FBI") in support of the wiretap authorization were "reasonab[ly] detail[ed]," *see United States v. Garcia-Villalba*, 585 F.3d 1223, 1229 (9th Cir. 2009), and did not contain a material misstatement or omission, *see United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008).

If the affidavit contains a "full and complete statement of the facts," the district court must determine in its discretion whether the affidavit submitted by the government shows that the wiretap is necessary given the possible effectiveness of traditional investigative techniques.[2] 18 U.S.C. § 2518(1)(b) & (3)(c).

In this case, the district court did not abuse its discretion in determining that the FBI had made the requisite showing of necessity. In particular, it was not "illogical" or "implausible" to conclude that the possibility of using a high-level confidential informant was unlikely to result in the successful prosecution of every member of the conspiracy. *See United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc). The district court's conclusion was supported by the facts in the record: (1) the informant cooperated only after he was arrested in a separate incident and may have been unwilling to provide further assistance out of fear of retaliation; (2) the informant could have jeopardized the investigation by tipping off his co-

---

[2] As shorthand, we have referred to this standard as the "necessity requirement," but the standard does not require that the wiretap be "necessary" in the strict sense of the word. *See*, *e.g.*, *Garcia-Villalba*, 585 F.3d at 1228 ("The necessity requirement can be satisfied by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." (quotation marks and citations omitted)).

conspirators; (3) the informant could have misled the investigators in an attempt to thwart the investigation or for personal gain; and (4) without the corroborating evidence collected using the wiretap, the informant's testimony may not have resulted in the successful prosecution of every member of the conspiracy.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The FBI began its investigation into the Westside Verdugo (a street gang subordinate to the Mexican Mafia) in early 2006.[3] One of the primary goals of the investigation was to determine the nature, extent, and methods of the Westside Verdugo's racketeering and narcotics-trafficking activities, including "the identities and roles of the suppliers, accomplices, aiders and abettors, co-conspirators, and participants."

During the course of the investigation, the FBI became familiar with the operations of the Westside Verdugo and its connection with the Mexican Mafia. The FBI discovered that, through violence and other means, the Westside Verdugo had controlled the streets of San Bernardino, California and other areas within San Bernardino County for 40 years. The FBI also became aware that the Mexican Mafia (with the help of the Westside Verdugo) controlled the importation of drugs into the southern California prison system. In fact, all narcotics smuggled into the prisons were purportedly "taxed" one-third of the total quantity by the Mexican Mafia. The taxed quantities were then re-disbursed and sold with the

---

[3] The facts in this section are drawn primarily from the August 26, 2010 affidavit submitted by Special Agent Matthew J. Tylman in support of the FBI's first wiretap application.

proceeds going to Mexican Mafia members and some Westside Verdugo leaders. Westside Verdugo members allegedly participated in narcotics trafficking, extortion of non-gang drug dealers in their neighborhoods, and crimes of violence intended to enhance the reputation of the gang and to protect their territory from the encroachment of other gang members.

As part of its investigation, the FBI sought to obtain wiretaps[4] on the telephones of several members of the Westside Verdugo including Jonathan Brockus.[5] On August 26, 2010, Special Agent Matthew J. Tylman submitted a 113-page affidavit in support of the FBI's request for wiretaps. The affidavit explained that Brockus had been involved with the Mexican Mafia and the Westside Verdugo since at least 2006. In fact, the affidavit revealed that Brockus played a significant role in the Mexican Mafia's drug distribution activities in San Bernardino.

The affidavit also recounted recent interactions between Brockus and law enforcement. On April 7, 2010, San Bernadino Police officers conducted a routine traffic stop of

---

[4] "Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, allows law enforcement agencies to conduct electronic surveillance of suspected criminal activities." *Garcia-Villalba*, 585 F.3d at 1227. "In a request for a court-authorized wiretap, the government must provide an application that includes, inter alia, 'a full and complete statement as to whether or not other investigative procedures have been tried and have failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Canales Gomez*, 358 F.3d 1221, 1224 (9th Cir. 2004) (quoting 18 U.S.C. § 2518(1)(c)).

[5] Defendants challenge only the authorization of the wiretap related to Jonathan Brockus.

Brockus and his girlfriend. During the traffic stop, officers found $2,200 in cash and arrested Brockus's girlfriend because she was found in possession of methamphetamine. The officers also arrested Brockus and transported him to a detention center, where he was investigated further. During the subsequent custodial interrogation, Brockus claimed that the methamphetamine belonged to him and that his girlfriend should not go to jail. Brockus told the officers that he was the current Westside Verdugo "shot-caller," which involved collecting money from narcotics sales on behalf of Mexican Mafia members as well as "secretary work," which involved finding out, through incarcerated contacts, who controlled the "yards" at a particular prison. Brockus also told the officers that he was recently contacted by a man known to him only as "Champ." Champ told Brockus that he was "collecting taxes" on behalf of Mexican Mafia member Sal Hernandez. Brockus told the officers that he had collected $1,000 from Westside Verdugo members and that he was supposed to give the money to Champ. Brockus was released from custody when he agreed to assist law enforcement authorities by identifying Champ.

On April 8, 2010, Brockus participated in a controlled delivery of $1,000 to Champ. After listening to a phone call between Brockus and Champ through Brockus's speaker phone, law enforcement provided Brockus with $1,000 to conduct a controlled delivery. Brockus then drove away to complete the controlled delivery while officers conducted surveillance. However, instead of driving immediately to the agreed upon location, Brockus first drove home. Approximately forty-five minutes later, Brockus left his home and drove around for about one hour, using what law enforcement described as counter-surveillance techniques. These counter-surveillance efforts prevented the officers from

covertly following and observing Brockus the whole time. As a result, the officers contacted Brockus by phone. Brockus stated that he was on his way to meet Champ at the agreed upon location. The controlled delivery was successfully completed, and the officers identified "Champ" as Randy Avalos.

Based on this incident and other facts revealed during the investigation, Special Agent Tylman made the following observations in the wiretap affidavit:

> I believe that interviewing Brockus and the other Target Subjects would be unproductive because these individuals would be uncooperative, especially due to the fear of physical retaliation that the [Westside Verdugo] and [the Mexican Mafia] are known to impose on those who cooperate with law enforcement, including death. Also, although Brockus had cooperated with law enforcement during a custodial interview on April 7, 2010, as it pertained to his (Brockus) collection of money from [Westside Verdugo] gang members. [sic] I believe based on my involvement in this investigation and my training and experience that Brockus minimized his role in an on-going criminal conspiracy. For example, during the custodial interview Brockus admitted that he does collect money from [Westside Verdugo] gang members involved in the distribution of narcotics; however, Brockus was not forthcoming about the amounts of money he collects, when he collects the money and from

whom he collects the money . . . . Brockus also never told the interviewing [Task Force Officers] about the types of narcotics being distributed in [Westside Verdugo] gang controlled neighborhoods or the individuals involved in transporting the narcotics to these neighborhoods. In addition, Brockus to date has never contacted law enforcement authorities to discuss his (Brockus) jail conversations with Sal Hernandez.[6] I also believe based on my involvement in this investigation and my training and experience that Brockus, if contacted by law enforcement agents, will provide misinformation about rival gang members in an effort to mask his on-going criminal activities and direct law enforcement resources in a direction that would allow him (Brockus) to easily avert law enforcement detection. Based on the above reasons I believe conducting these interviews poses the risk of alerting associates, accomplices, and other conspirators to the existence of the investigation and thereby make them more cautious and more difficult to investigate. For these reasons, I believe interviews of subjects or associates at this point in the investigation will not further the investigation's goals.

---

[6] In May 2010, law enforcement obtained two recorded jail calls from Hernandez to Brockus in which the two discussed various illegal activities related to the Westside Verdugo and the Mexican Mafia.

Based on Special Agent Tylman's affidavit, the district court authorized a wiretap on Brockus's telephone.

On July 8, 2010, law enforcement interviewed Brockus regarding the murder of Daniel Martinez. Brockus stated that he had no solid information regarding the identity of the murderer, but he "surmised" that Andrew Rodriguez (a member of the Mexican Mafia) may have ordered the murder.

The district court renewed the wiretap authorization on September 26, 2010, October 29, 2010, and December 6, 2010. The renewals were each granted based on a new affidavit by Special Agent Tylman. However, these affidavits did not mention the July interview.

As a result of the wiretap, the FBI intercepted incriminating conversations between Brockus and various members of the Westside Verdugo, including Defendants. On September 13, 2010, Estrada and Brockus exchanged a series of text messages in which Estrada attempted to purchase heroin from Brockus. Between October 14, 2010, and October 19, 2010, the FBI intercepted another conversation between Brockus and Estrada. In that conversation Brockus told Estrada that his heroin supplier had been arrested and that he needed to find a new one. Estrada then agreed to contact a supplier in Los Angeles. Estrada offered to provide Brockus a sample of the supplier's heroin before Brockus decided to purchase a large quantity. The remainder of the conversation shows that Estrada went to Los Angeles, purchased two ounces of heroin from the supplier, and delivered it to Brockus in San Bernardino. On December 26, 2010, the FBI intercepted a series of text messages between Mark Rios and Brockus. At the time, Rios was incarcerated at the California Rehabilitation Center. Using coded

language, the messages discussed the collection of drug proceeds at the prison yard. Then, on January 3, 2011, Rios spoke with Brockus over the phone regarding the distribution of drug proceeds and smuggled cell phones to three Mexican Mafia members incarcerated at the California Rehabilitation Center. This conversation was also intercepted pursuant to the wiretap on Brockus's cell phone.

On January 11, 2011 (after the expiration of the wiretap), the FBI interviewed Brockus regarding the drug conspiracy investigation. When he was informed of the purpose of the interview, Brockus provided information helpful to the investigation. Brockus eventually testified before a grand jury. The grand jury returned an indictment, charging Defendants (along with 50 other individuals) with conspiracy to distribute and possession with intent to distribute heroin and methamphetamine.

Prior to trial, Defendants sought to suppress the incriminating statements that had been intercepted by the government. They claimed that the affidavits supporting the wiretap applications were deficient, but the district court denied the motion. Consequently, Defendants pleaded guilty and reserved the right to appeal the denial of their motion to suppress.

## II. DISCUSSION

### A. The Affidavits Contained a Full and Complete Statement of the Facts

On appeal, Defendants argue that the affidavits contained material omissions. We disagree.[7]

"We review de novo whether the information submitted in an affiant's affidavit amounts to 'a full and complete statement of the facts . . . .'" *United States v. Canales Gomez*, 358 F.3d 1221, 1224 (9th Cir. 2004) (quoting 18 U.S.C. § 2518(1)(c)). Regarding an application for a wiretap, the affidavit is sufficient as long as it "as a whole speaks in case-specific language" even if "some language in the affidavit may be conclusory or merely describe[s] the inherent limitations of certain investigatory techniques." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1230 (9th Cir. 2009). Importantly, even when additional information could have been included, the affidavit is sufficient as long as it is "reasonab[ly] detail[ed]." *Id.* at 1229.

A false statement or omission in a supporting affidavit will invalidate a warrant only if the omission is material. *United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008). To determine whether a false statement is material, "the reviewing court should set the affidavit's false assertions to one side and then determine whether the affidavit's remaining

---

[7] We have jurisdiction to review the district court's denial of the motion to suppress. 28 U.S.C. § 1291. "We review de novo a district court's wiretap suppression decision." *United States v. Reyna*, 218 F.3d 1108, 1110 (9th Cir. 2000).

content is still sufficient to establish [necessity]." *See United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985).

### 1.

Defendants first argue that the affidavits improperly omitted information regarding the availability of state wiretaps. We disagree.

An application for a federal wiretap need not discuss the availability of state wiretaps, because "[t]he purpose of the necessity requirement is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Garcia-Villalba*, 585 F.3d at 1227 (quoting *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988)). A wiretap authorized by a state court is not a traditional investigative technique any more than a wiretap authorized by a federal court is a traditional investigative technique. Although the procedures for obtaining a federal and state wiretap may differ, *Villa v. Maricopa County*, 865 F.3d 1224, 1230 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1696 (2018), there is no meaningful difference in the level of intrusiveness. Indeed, because both methods are equally intrusive, they are subject to the same minimum requirements under federal law. *See id.*; 18 U.S.C. §§ 2516, 2518. Thus, failing to discuss the availability of state wiretaps was not a material omission.

### 2.

Defendants next argue that the affidavits omitted information regarding Brockus. This argument is similarly unavailing.

The affidavits at issue in this case "did more than recite the inherent limitations of using confidential informants; [they] explained in reasonable detail why each confidential source or source of information was unable or unlikely to succeed in achieving the goals of the . . . investigation. That is sufficient." *Rivera*, 527 F.3d at 899. The affidavits disclosed that Brockus had cooperated with the Government previously in a limited way, and gave specific reasons why using Brockus as an informant as to the conspiracy generally was not a viable option going forward.

Defendants, however, fault Special Agent Tylman for failing to mention in his warrant affidavit the July 2010 interview regarding the murder of Daniel Martinez. "However, we have not required such a level of detail in a wiretap application." *Id.* Thus, "we conclude that this failure, given the level of detail in the affidavit as a whole, does not render the affidavit inadequate for purposes of § 2518(1)(c)." *Id.* Even if failing to discuss the interview were an omission, it was not material. The interview would have provided very little evidence that Brockus was willing and able to assist the FBI in taking down the Westside Verdugo and related Mexican Mafia members. In the interview, Brockus "surmised" that a Mexican Mafia member may have ordered the murder of Martinez. If in fact Brockus knew who had ordered the murder, then his cooperation was less than complete and would indicate that he was not willing to cooperate. On the other hand, if Brockus did not know who ordered the murder, he likely didn't have access to enough information to bring down the conspiracy because he have didn't have complete knowledge of the Mexican Mafia's activities in San Bernardino. Thus, as will be discussed below, the affidavits would have been "sufficient to establish

[necessity]" even if the interview had been discussed in the affidavits.  *See Ippolito*, 774 F.2d at 1485.

## B. The District Court did not Abuse Its Discretion in Authorizing the Wiretap

We also disagree with Defendants' argument that the district court abused its discretion in determining that the wiretaps were necessary.

"The judge authorizing a wiretap has considerable discretion." *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986). Thus, a district court's determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c), "is reviewed under an abuse of discretion standard." *Canales Gomez*, 358 F.3d at 1225. A district court abuses its discretion if it fails to apply the correct legal standard or if its application of the correct standard is "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc).

"[T]he wiretap should not ordinarily be the initial step in the investigation, but . . . law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." *United States v. McGuire*, 307 F.3d 1192, 1196–97 (9th Cir. 2002) (footnote omitted). Thus, "[w]hen reviewing necessity we employ a 'common sense approach' to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." *United*

*States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005), *amended on denial of reh'g*, 437 F.3d 854 (9th Cir. 2006) (quoting *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001)). "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to 'develop an effective case against those involved in the conspiracy.'" *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006) (quoting *Brone*, 792 F.2d at 1506). An "effective case" is a case in which the government has "evidence of guilt beyond a reasonable doubt." *McGuire*, 307 F.3d at 1198.

Depending on the circumstances, the use of confidential informants can be an unreliable investigative method. "Indeed, we have previously explained that '[t]he use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril.'" *Canales Gomez*, 358 F.3d at 1226 (alteration in original) (quoting *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993)). "Not only common sense but also our precedent confirms that the existence of informants and undercover agents does not preclude a necessity finding." *McGuire*, 307 F.3d at 1199. Thus, "[t]he government need not show that informants would be useless in order to secure a court-authorized wiretap." *Canales Gomez*, 358 F.3d at 1226.

Moreover, the FBI was not conducting an ordinary criminal investigation; this was an investigation into an elaborate and widespread drug distribution conspiracy. "[T]he government is entitled to more leeway in its investigative methods when it pursues a conspiracy." *McGuire*, 307 F.3d at 1198. "Unlike individual criminal action, which comes to an end upon the capture of the criminal, collective criminal action has a life of its own. Like the Hydra of Greek

mythology, the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed." *Id.* at 1197–98. In addition, "any previous success from the use of confidential informants is . . . less persuasive in the context of an investigation of criminal conspiracy." *Canales Gomez*, 358 F.3d at 1226. Thus, "we have 'consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." *McGuire*, 307 F.3d at 1198 (alteration in original) (quoting *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990)).

Given this precedent, the district court did not abuse its discretion in concluding that using Brockus as a confidential informant was unlikely to result in the successful prosecution of each and every member of the conspiracy. Defendants argue that Brockus was in a unique position to "penetrate and dismantle" the conspiracy because he was essentially a ringleader, and that his prior cooperation showed that he was willing and able to cooperate with law enforcement.[8] However, the affidavit gave three specific reasons why using Brockus as a confidential informant was unlikely to work particularly well.

First, Special Agent Tylman believed that Brockus would be uncooperative due to the fear of physical retaliation by the Mexican Mafia. We have recognized that using confidential informants to investigate the Mexican Mafia is particularly

---

[8] It should be noted that, although Brockus was the leader of the Westside Verdugo, he was not the leader of the drug distribution conspiracy. The Westside Verdugo–including Brockus–reported to the Mexican Mafia.

problematic. *United States v. Rodriguez*, 851 F.3d 931, 942 (9th Cir. 2017). Indeed, we have approved of the Government's blanket explanation that confidential informants could not be used, because "the Mexican Mafia 'ruthlessly punishes law enforcement cooperators,' and the organization's reputation 'has caused and will continue to cause potential cooperators . . . to resist recruitment by law enforcement.'" *Id.* (alteration in original).

This justification applies to Brockus despite his past cooperation. Brockus's cooperation was minimal and was obtained after he had been arrested. He participated in one controlled delivery of drug money in an apparent exchange for his girlfriend not being charged with a serious crime. Those circumstances do not indicate that Brockus would have cooperated of his own accord in a broad investigation of the Westside Verdugo and the Mexican Mafia conspiracy. The July 2010 interview also does not demonstrate that Brockus was willing to cooperate because he did not give law enforcement any reliable information. Instead, he merely "surmised" that a certain member of the Mexican Mafia might have been responsible for ordering the murder of Daniel Martinez. The fact that the government eventually sought Brockus's cooperation after the expiration of the wiretaps is not contrary to this reasoning. At that point, the government had a great deal of information that directly incriminated Brockus.

Second, if Brockus refused to cooperate, asking him to do so could have endangered the entire investigation. *See Torres*, 908 F.2d at 1422 (finding that certain investigative techniques could not be used, because they might alert the suspects to an ongoing investigation). As Special Agent Tylman noted, interviewing Brockus about the ongoing investigation would

"pose[] the risk of alerting associates, accomplices, and other conspirators to the existence of the investigation and thereby make them more cautious and more difficult to investigate." In fact, as the "shot caller" of the Westside Verdugo, Brockus was in the ideal position to thwart the investigation's efforts, because he could direct his subordinates to take extra precautions to evade surveillance. The district court did not abuse its discretion when it agreed with Special Agent Tylman's assessment.

Third, Special Agent Tylman noted that "Brockus, if contacted by law enforcement agents, [may have] provide[d] misinformation about rival gang members in an effort to mask his on-going criminal activities and direct law enforcement resources in a direction that would [have] allow[ed] him (Brockus) to easily avert law enforcement detection." In other words, Brockus might feign cooperation in order to thwart the investigation or to further his own objectives within the Westside Verdugo. Again, as the "shot caller" of the Westside Verdugo, Brockus was in an ideal position to provide law enforcement with misleading and self-serving information. As a result, it was not illogical for the district court to conclude that attempting to use Brockus as an informant posed serious risks to the success of the investigation.

Further, an investigation of a conspiracy is successful only if it obtains "evidence of guilt *beyond a reasonable doubt*, not merely evidence sufficient to secure an indictment." *McGuire*, 307 F.3d at 1198 (emphasis added). The Government is not required to investigate a conspiracy with one-hand tied behind its back. Rather, to obtain a wiretap, the Government need only show that traditional means of investigation are unlikely to result in evidence that

each member of the conspiracy is guilty beyond a reasonable doubt. *Decoud*, 456 F.3d at 1007.

We take a "common sense approach" to evaluating the likelihood of success of using confidential informants. *Gonzalez*, 412 F.3d at 1112 (quoting *Blackmon*, 273 F.3d at 1207). In doing so, "[w]e have stressed repeatedly that informants as a class, although indispensable to law enforcement, are oftentimes untrustworthy." *Canales Gomez*, 358 F.3d at 1226–27. We have also noted that:

> On occasion, informants mislead investigators and prosecutors in order to feather their own nests. Indeed, juries in federal cases are routinely instructed that the testimony of witnesses receiving anything from the government in return for the witness's cooperation must be examined with greater caution than that of other witnesses. There is not a trial lawyer alive who does not understand that juries are wary of any witness receiving a benefit for testifying. Here, the government is to be commended for its interest in wiretap evidence, which, compared to the word of an informant either in the field or in court, is the gold standard when it comes to trustworthy evidence. The truth-seeking function of our courts is greatly enhanced when the evidence used is not tainted by its immediate informant source and has been cleansed of the baggage that always comes with them. Moreover, wiretap evidence out of the mouths of defendants is valuable corroboration of informant testimony. Such

evidence serves also to ensure that what investigators are being told by informants is accurate, a very valuable function that guards against the indictment of the innocent. Indeed, the Supreme Court has opined that a jury may understandably be unfavorably impressed with evidence of the police's uncritical readiness to accept the story and suggestions of an informant whose accounts were inconsistent.

*Id.* at 1227 (quotation marks and citations omitted). Because confidential informants may not be believed by a jury, *id.* at 1226–27, the testimony of a confidential informant (without significant corroborating evidence) often will not produce an effective case. The district court did not abuse its discretion in drawing that conclusion based on the specific facts presented in the affidavits.[9] *See Hinkson*, 585 F.3d at 1251.

**AFFIRMED.**

---

[9] We express no opinion regarding whether the government was conclusively entitled to a wiretap based on the facts in the affidavit. We merely affirm the district court's discretionary decision that the government met the requisite showing of necessity under 18 U.S.C. § 2518(3)(c).