OPINION OF THE COURT
Steven W. Fisher, J.
In two consolidated indictments, defendant Gerald Garson, a Justice of the Supreme Court of the Second Judicial District, stands charged with one count of bribe receiving in the third degree, six counts of receiving reward for official misconduct in the second degree, three counts of official misconduct, and one count of receiving unlawful gratuities. All the charges relate to the defendant’s conduct as a judge presiding over matrimonial cases in the Supreme Court of Kings County.
In the motion now before the court, the defendant seeks dismissal of the indictments on the grounds that the evidence presented to the grand jury was not legally sufficient, and that the grand jury proceeding that produced the second indictment was defective. The defendant maintains further that the counts charging receiving reward for official misconduct in the second degree and official misconduct must be dismissed on the additional ground that the statutes defining those crimes are unconstitutionally vague as applied in this case. In the event that the indictments are not dismissed, the defendant seeks additional discovery, and argues that the eavesdropping and video surveillance evidence must be suppressed because it was unlawfully obtained and because the People never procured a valid indictment charging a designated offense.
I. Legal Sufficiency of Grand Jury Evidence
A. Bribe Receiving in the Third Degree
A review of the testimony and exhibits presented to the grand jury reveals that the evidence was legally sufficient to support *261 the count charging the defendant with the class D felony of bribe receiving in the third degree for having accepted benefits from an attorney upon an understanding that the defendant’s actions and his exercise of discretion as a judge would thereby be influenced (Penal Law § 200.10; cf. People v Tran, 80 NY2d 170 [1992]).
B. Receiving Reward for Official Misconduct in the Second Degree
Section 200.25 of the Penal Law defines the class E felony of receiving reward for official misconduct in the second degree as follows: “A public servant is guilty of receiving reward for official misconduct in the second degree when he solicits, accepts or agrees to accept any benefit from another person for having violated his duty as a public servant.” In contrast to the crime of bribe receiving, which is concerned with what a public servant will do in the future, the crime of receiving reward for official misconduct is directed at benefits conferred upon a person for having violated his or her duty as a public servant in the past (see Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law art 200, at 262; see also People v Stokner, 152 Misc 2d 463 [Crim Ct, Queens County 1991, Rosengarten, J.]).
Thus, in any prosecution for receiving reward for official misconduct, the evidence must identify a duty the defendant had as a public servant, and must establish that he or she violated that duty and thereafter solicited, accepted or agreed to accept a benefit for having done so.
The People here allege that the defendant violated two duties he had as a public servant. To identify those duties, the People cite two provisions in a section of the Rules of the Chief Administrator of the Courts entitled “Judicial Conduct.”[1] The first prohibits unauthorized ex parte communications (see Rules of Judicial Conduct [22 NYCRR] § 100.3 [B] [6]); the second forbids lending the prestige of judicial office to advance private interests (see 22 NYCRR 100.2 [C]).
The People offered evidence to the grand jury to establish that the defendant engaged in ex parte conversations with an attorney representing a party in a case then pending before *262 him, and sometime later accepted a box of expensive cigars for having done so. The People contend that, when the defendant engaged in those ex parte conversations, he broke a binding rule of judicial conduct, and thereby violated his duty as a public servant. According to the People, when the defendant accepted the cigars for having engaged in those conversations, he accepted a benefit for having violated his duty as a public servant, and thereby committed the crime of receiving reward for official misconduct in the second degree as charged in one count of the consolidated indictments.
The People also offered evidence to the grand jury to establish that the defendant referred five potential clients, each of whom knew he was a judge, to the same lawyer, and later accepted “referral fees” from him for having done so. The People’s position is that, each time the defendant referred a client to the lawyer, he lent the prestige of his judicial office to advance the lawyer’s private interests, thereby breaking a binding rule of judicial conduct and violating his duty as a public servant. The People maintain that, each time the defendant accepted a fee for having referred a client, he accepted a benefit for having violated his duty as a public servant, and thereby committed the crime of receiving reward for official misconduct in the second degree as alleged in the remaining five counts of the consolidated indictments charging that crime.
Relying largely on People v La Carrubba (46 NY2d 658 [1979]), the defendant argues that, even if true, this evidence establishes nothing more than a violation of ethical rules of judicial conduct which may not be enforced through criminal prosecution.
In La Carrubba, a District Court Judge in Suffolk County was indicted for official misconduct. The single count upon which she was convicted alleged that, with the intent to obtain a benefit, the judge knowingly refrained from performing a duty that was imposed upon her by law or was clearly inherent in the nature of her office when, before the return date of a simplified traffic information received by a close personal friend, she improperly dismissed it for failure to prosecute. The count specifically alleged that her conduct was “in violation of . . . the Code of Judicial Conduct, Canons 2 and 3” {id. at 661). Those canons had been promulgated initially by the American Bar Association and the New York State Bar Association, and had then been incorporated by reference in the Rules of the Appellate Division, Second Department.
*263 The Court of Appeals reversed the conviction and dismissed the charge, holding that “provisions of the Code of Judicial Conduct which do not come within the ambit of one of the express proscriptions of the Penal Law and which have never been adopted by the Legislature may not be enforced by resort to criminal prosecution” (id. at 665; see also Clayton v Willis, 489 So 2d 813 [Fla App, 5th Dist 1986]). The Court observed that “ ‘[i]t is for the legislative branch of . . . government to determine, within state or federal constitutional limits, the kind of conduct which shall constitute a crime . . .’ ” (La Carrubba, 46 NY2d at 663, quoting 1 Torcia, Wharton’s Criminal Law § 10, at 31-32 [14th ed 1978]).
The defendant contends that, like the Code of Judicial Conduct at issue in La Carrubba, the Rules of Judicial Conduct were never enacted or adopted by the Legislature and therefore may not be enforced through criminal prosecution. The People counter that La Carrubba is distinguishable principally on the ground that, unlike the Code of Judicial Conduct, the Rules of Judicial Conduct are binding upon judges by constitutional command.
Section 20 (a) of article VI of New York’s Constitution provides that “Judges . . . shall... be subject to such rules of conduct as may be promulgated by the chief administrator of the courts with the approval of the court of appeals.” In effect, the People contend that this provision confers upon the Chief Administrator, acting with the approval of the Court of Appeals but without the necessity of legislative concurrence or ratification, the authority to define an element of a crime by issuing rules prescribing a judge’s duties as a public servant. Assuming without deciding that the provision does so, the authority it confers has not been effectively exercised.
Much like the Code of Judicial Conduct which it parallels, the Rules of Judicial Conduct part of the Rules of the Chief Administrator of the Courts (22 NYCRR part 100) is, in large measure, a compilation of ethical standards, goals, and aspirations that are stated in broad and general terms. Thus, for example, the rules provide that “[a] judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved” (22 NYCRR 100.1), and that “[a] judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartial *264 ity of the judiciary” (22 NYCRR 100.2 [A]), and that “[a] judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge’s direction and control” (22 NYCRR 100.3 [B] [3]).
The notion that rules like these can define an element of a crime is untenable. Although even general rules of judicial conduct have been held sufficiently definite to allow disciplinary action for their violation (see e.g. Matter of Sims, 61 NY2d 349, 358 [1984]), principles of due process demand that, before criminal liability is imposed, the law alleged to have been violated defines the offense in a way that gives fair notice of what conduct is prohibited in language that does not permit or encourage arbitrary and discriminatory enforcement (see e.g. Kolender v Lawson, 461 US 352, 357 [1983]; People v Bright, 71 NY2d 376, 382 [1988]; People v First Meridian Planning Corp., 86 NY2d 608, 621-622 [1995]; see also People v Stuart, 100 NY2d 412 [2003]; United States v Rybicki, 354 F3d 124, 129 [2d Cir 2003]).
The first of the two rules at issue here provides in pertinent part that “[a] judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers concerning a pending or impending proceeding” (22 NYCRR 100.3 [B] [6]). But the rule itself then lists five separate and broadly-stated exceptions,[2] including one that permits a judge to initiate and consider an ex parte communication “when autho *265 rized by law to do so.” (22 NYCRR 100.3 [B] [6] [e].) In the context of disciplinary proceedings, the rule has been applied to cover such varied conduct as a judge signing a search warrant and then alerting the target’s attorney to the impending search (Matter of Gibbons, 98 NY2d 448 [2002]), and a judge having communications with a nonparty former political leader about an adjournment in a pending case (Matter of Levine, 74 NY2d 294 [1989]).
The second rule provides that “[a] judge shall not lend the prestige of judicial office to advance the private interests of the judge or others” (22 NYCRR 100.2 [C]). Again, in the context of disciplinary proceedings, this rule has been held violated where, for example, a judge interceded in two pending criminal cases for the purpose of seeking lenient treatment for the defendants (Matter of Kiley, 74 NY2d 364 [1989]), and where a judge directed defendants in traffic cases to call a private defensive driving school, and distributed pamphlets describing its program, all while the school’s director sat with the judge on the bench (Matter of Assini, 94 NY2d 26 [1999]). Indeed, our Court of Appeals has broadly stated that the rule is violated whenever a judge “acts in such a way that she appears to have used the prestige and authority of judicial office to enhance personal relationships, or for purely selfish reasons, or to bestow favors, . . . whether or not the Judge acted deliberately and overtly” (Matter of Sims, 61 NY2d at 358).
In light of both their language and their application, the two rules at issue here are problematic when employed to define an element of a crime. And, significantly, they were never meant to be used for that purpose.
The part of the Rules of the Chief Administrator entitled “Judicial Conduct” begins with a Preamble that states in pertinent part: “The rules are designed to provide guidance to judges and candidates for elective judicial office and to provide a structure for regulating conduct through disciplinary agencies. They are not designed or intended as a basis for civil liability or criminal prosecution.” (Rules of Judicial Conduct [22 NYCRR] part 100 [emphasis supplied].)
Established by the State’s Constitution and its Judiciary Law, New York’s Commission on Judicial Conduct is the disciplinary agency charged with investigating complaints related to the *266 conduct of judges and the performance of their official duties, and with determining whether a judge should be admonished, censured, or removed from office for acts of misconduct (see NY Const, art VI, § 22; Judiciary Law art 2-A). As is evident from their Preamble, the Rules of the Chief Administrator are intended to provide a structure for regulating judicial conduct through the Commission, and not through criminal prosecution which is available only when a judge’s conduct violates a criminal statute as well as a rule (see e.g. La Carrubba, 46 NY2d at 663-664). Here, the duties as a public servant allegedly violated by the defendant are defined, not by any statute, but solely by the Rules of the Chief Administrator that were “not designed or intended as a basis for . . . criminal prosecution.” (22 NYCRR part 100, Preamble.)
The People nevertheless find significance in the fact that the defendant is being prosecuted, not merely for violating a rule, but for accepting a benefit for having done so. But the Court of Appeals brushed aside a similar argument in La Carrubba: “Nor does it affect the outcome that [the statute] requires an ‘intent to obtain a benefit or to injure or deprive another person of a benefit’. Most unethical conduct falls into the former category, or so it could be found” (46 NY2d at 665). Moreover, the defendant’s violation of a duty as a public servant is an essential element of the crime that must be established separate and apart from his acceptance of a benefit.
The District Attorney has pointed to no instance in which a judge in this state has been successfully prosecuted for a crime of which an essential element was the violation of a Rule of the Chief Administrator of the Courts. Indeed, those cases in which judges have been sanctioned for violating the two rules in issue here have all involved disciplinary proceedings, not criminal prosecutions (see e.g. Matter of Levine, 74 NY2d 294 [1989] [judge removed from office in disciplinary proceeding for having had improper ex parte communications]; Matter of Assini, 94 NY2d 26, 31 [1999] [judge removed from office in disciplinary proceeding for having “len(t) the prestige of judicial office to advance the private interests of . . . others”]).
In sum, although the Chief Administrator of the Courts has properly promulgated enforceable ethical standards, I hold that he has not discharged, nor has he attempted to discharge, the legislative responsibility of defining elements of crimes. Accordingly, evidence presented to the grand jury that the defendant violated the Rules of the Chief Administrator is legally insuf *267 ficient to establish that he violated a duty he had as a public servant within the meaning of the Penal Law. The grand jury evidence, therefore, fails to establish an essential element of each of the counts charging the crime of receiving reward for official misconduct in the second degree.
C. Official Misconduct
Section 195.00 of the Penal Law defines the class A misdemeanor of official misconduct as follows:
“A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit
“[h]e commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized; or . . .
“[h]e knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.”
The three counts of official misconduct here are premised, not upon the violation of a rule of judicial conduct, but upon the defendant’s alleged violation of a prohibition enacted by the Legislature as section 18 of the Judiciary Law. That statute provides in pertinent part that “[a] judge . . . shall not demand or receive a fee or other compensation for giving his advice in an action, claim, matter, motion or proceeding pending before him, or which he has reason to believe will be brought before him for decision.” (Judiciary Law § 18.)
The evidence presented to the grand jury was legally sufficient to establish that the defendant, acting with the intent to obtain a benefit and knowing that he was not authorized to do so, received compensation in the form of a box of expensive cigars for giving advice to an attorney who was representing a party in a case then pending before him, and thereby committed an act relating to his office but constituting an unauthorized exercise of his official functions. Thus, the grand jury evidence was legally sufficient to support a charge of official misconduct.
The consolidated indictments, however, contain three separate counts charging that crime. One is based on the theory that the defendant committed an act relating to his office but constituting an unauthorized exercise of his official functions when he gave advice to the attorney. A second count is based on the theory that the defendant committed such an act when he *268 received, the box of cigars as compensation. And a third count is based on the theory that the defendant knowingly refrained from performing a duty which was imposed upon him by law or was clearly inherent in the nature of his office when he failed to return the box of cigars.
Section 18 of the Judiciary Law forbids a judge from receiving compensation for giving his advice in an action pending before him. The People correctly argue that, when the defendant allegedly received compensation for giving advice to the lawyer in a case pending before him, he committed an act relating to his office but constituting an unauthorized exercise of his official functions, and thereby became liable to a charge of official misconduct. But the defendant cannot be charged with that crime twice, once for having given advice and a second time for having received compensation (see People v Senisi, 196 AD2d 376, 382 [2d Dept 1994]; see also People v Aarons, 296 AD2d 508 [2d Dept 2002], lv denied 99 NY2d 532 [2002]). The Judiciary Law’s prohibition is directed, not at advice and compensation separately, but at compensation for advice. Nor can the defendant be charged with official misconduct for having violated what the People see as a public servant’s duty to return compensation that he unlawfully accepts.
Accordingly, I hold that the grand jury evidence is legally sufficient to support one, but only one, count of official misconduct. I note that the indictment as returned unambiguously reflects a finding by the grand jury that the defendant received compensation for advice. Inasmuch as that finding is supported by legally sufficient evidence, the defendant may be prosecuted for official misconduct as charged in the second count of indictment No. 5332/03.
D. Receiving Unlawful Gratuities
A review of the testimony and exhibits presented to the grand jury reveals that the evidence was legally sufficient to support the count charging the defendant with the class A misdemeanor of receiving unlawful gratuities in that he allegedly accepted benefits from an attorney for having engaged in official conduct as a judge which he was authorized to perform, and for which he was not entitled to any special or additional compensation (Penal Law § 200.35).
II. The Second Grand Jury Proceeding
Subdivision (1) of section 190.75 of the Criminal Procedure Law provides that, if a grand jury finds that the evidence *269 presented against a potential defendant is legally insufficient to establish the defendant’s commission of a crime, or fails to provide reasonable cause to believe that the defendant committed that crime, the grand jury must dismiss the charge, and file the dismissal with the court. Subdivision (3) of the same section provides that, where a charge has been so dismissed, it may not be submitted again unless the court authorizes or directs the People to resubmit the charge to the same or another grand jury.
In People v Wilkins (68 NY2d 269 [1986]), the Court of Appeals held that, because the statutory scheme governing grand jury proceedings contemplates that deliberations will not end without some grand jury action, a prosecutor’s withdrawal of a case from the grand jury after presentation of the evidence is the equivalent of a dismissal, and therefore triggers the requirement that judicial authorization be obtained before the matter is resubmitted.
The defendant challenges the second indictment here because the People failed to submit to the grand jury the charge of bribe receiving in the third degree, or the additional charges of official misconduct, before the grand jury returned the first indictment. The defendant contends that the failure to submit those charges was tantamount to their withdrawal and therefore, under the holding of Wilkins, to a dismissal. He argues that, as a result, the People were required to secure court authorization before submitting the charges and, because they did not, the grand jury proceeding that resulted in the second indictment was defective and the second indictment should be dismissed (see CPL 210.20 [1] [c]; 210.35 [5]).
At the core of the defendant’s argument is the suggestion that, when presenting a case to a grand jury, a prosecutor is obligated to submit for consideration all at once every piece of available evidence and every charge arguably arising out of the criminal transaction under investigation. There is no such requirement (cf. People v Rodriguez, 261 AD2d 111, 113 [1st Dept 1999], lv denied 93 NY2d 978 [1999]).
In this case, the People presented evidence of certain crimes and asked the grand jury to consider charging the defendant with them. The grand jury accepted the People’s evidence and returned the first indictment, charging the defendant with each of the crimes submitted for consideration. Thereafter, the People presented further evidence to the same grand jury and asked it to consider indicting the defendant for additional crimes. The grand jury did so.
*270 In my view, nothing in this sequence implicates the concerns addressed by the statute and the case law. The prosecutor did not present charges to a second grand jury after they had been rejected by a first, and did not engage in forum shopping by withdrawing a case from one grand jury in the hope of later presenting the same evidence to a more compliant second one (see e.g. People v Wilkins, 68 NY2d at 273, 275; People v Gelman, 93 NY2d 314, 318-319 [1999]).
The grand jury here acted upon each charge submitted for its consideration. No charge was rejected, none was withdrawn, and important additional evidence was presented before the second indictment was returned. Significantly, there is nothing to suggest that, before deliberating on the initial charges, the grand jury was aware of, or considered, the charge of bribe receiving that it would later lodge against the defendant (see People v Wilkins, 68 NY2d at 274; People v Nelson, 298 NY 272, 276 [1948]).
Moreover, as a practical matter, when the People presented the additional evidence after the first indictment was filed, they could have asked the grand jury, which had now heard all the evidence, to return a single superseding indictment against the defendant containing the old charges as well as the new (see, People v Cade, 74 NY2d 410, 416 [1989]; cf. People v Piening, 99 AD2d 583 [3d Dept 1984]). Had the People followed that course, it is clear that no court authorization would have been required (CPL 200.80; People v Cade, 74 NY2d at 414; People v Rodriguez, 11 NY2d 279, 286 [1962]; cf. People v Jackson, 87 NY2d 782, 789 [1996]). I hold that none was required here.
I therefore reject the contention that the grand jury proceeding which resulted in the second indictment was defective.
III. The Eavesdropping and Video Surveillance Evidence
The defendant’s challenge to the eavesdropping and video surveillance evidence is not directed at the form of the applications or the warrants, or at the manner in which the warrants were executed. Instead, he argues that the evidence must be suppressed because the applications did not make out probable cause sufficient to support the issuance of the warrants, and because they did not establish that normal investigative procedures were unlikely to succeed in obtaining the evidence sought. The defendant also contends that suppression is *271 required because the surveillance unlawfully continued after the authorized objectives had been achieved.[3]
A. Probable Cause
An eavesdropping or video surveillance warrant may not be issued unless the application for it makes out probable cause to believe that a particular individual is committing, has committed, or is about to commit a designated offense, and that communications or observations concerning that offense will be obtained through the proposed electronic surveillance (CPL 700.15 [2], [3]). Moreover, if the factual allegations contained in the application are derived in whole or in part from the statements of persons other than the applicant, the application must contain facts establishing the reliability of the informants or the reliability of the information they supplied (see CPL 700.20 [3]).
The level of information required to establish probable cause for the issuance of an eavesdropping warrant is the same as that necessary for a search warrant (People v Tambe, 71 NY2d 492, 500 [1988]). “The substance of all the definitions of probable cause is a reasonable ground for belief of guilt” (Brinegar v United States, 338 US 160, 175 [1949] [internal quotation marks omitted]). The standard requires an evaluation of probabilities measured against “the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.” (Id. at 175.) Probable cause turns on the totality of circumstances, and, because it deals with probabilities, it is incapable of precise definition (see Maryland v Pringle, 540 US 366, —, 124 S Ct 795, 800 [2003]). Instead, it is “a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules” (Illinois v Gates, 462 US 213, 232 [1983]).
Thus, probable cause for the issuance of an eavesdropping or video surveillance warrant can be said to exist when the totality of facts and circumstances detailed in the application allows the issuing judge to conclude that it is more probable than not that *272 a particular individual is committing, has committed, or is about to commit a designated offense, and that communications or observations concerning that offense will be obtained through the electronic surveillance proposed (cf. People v Carrasquillo, 54 NY2d 248, 254 [1981]; People v Bland, 302 AD2d 926 [4th Dept 2003], lv denied 99 NY2d 652 [2003]; People v Fellows, 239 AD2d 181, 183-184 [1st Dept 1997], lv denied 90 NY2d 893 [1997]; People v Ortiz, 224 AD2d 452 [2d Dept 1996], lv denied 88 NY2d 882 [1996]; CPL 700.15 [2], [3]).
Moreover, the judge has considerable discretion in determining the sufficiency of the application (see People v Manuli, 104 AD2d 386, 387 [2d Dept 1984]; People v Ianniello, 156 AD2d 469, 470 [2d Dept 1989]), and a finding of probable cause is entitled to great deference from a reviewing court (see e.g. People v Cahill, 2 NY3d 14 [2003]; People v Griminger, 71 NY2d 635, 640 [1988]; People v Migenis, 167 AD2d 956 [4th Dept 1990]).
The defendant here argues that the woman who first came to the District Attorney with allegations that improper influence was being exerted in matrimonial cases pending before the defendant was never shown to be reliable or to be supplying reliable information. The defendant contends that the warrant applications demonstrated that she was little more than a disgruntled litigant who feared that she was about to lose custody of her children. He points out that there was a criminal case pending against her involving charges that she had assaulted her oldest child. And he stresses that her claim that she had participated in a three-way telephone conversation with the defendant was belied by the inability of investigators to find any evidence that such a call took place.
Ordinarily, as an identified citizen bringing an accusation of criminal conduct to the authorities, the woman would be accorded a presumption of reliability because she faced prosecution if her report proved to be a fabrication (see e.g. People v Hicks, 38 NY2d 90, 94 [1975]; People v Brown, 40 NY2d 183, 188 [1976]; People v Inman, 80 AD2d 622 [2d Dept 1981]). But even assuming that the defendant has overcome that presumption, suppression is still not required because none of the warrants in this case was issued solely on the basis of uncorroborated information supplied by the woman.
Well before any application was made for an eavesdropping warrant, the District Attorney secured consent recordings through the woman’s cooperation. Wearing a body recorder, she captured Nissim Elmann on tape claiming that he could influ *273 ence cases pending before the defendant, and taking $5,000 to see that the woman would prevail in her custody dispute. Independent investigation soon established that a series of some 16 telephone calls had been made to Elmann from a telephone in the defendant’s courtroom. Detectives also learned of a connection and telephone contact between Elmann and a divorce attorney, Paul Simonovsky, who was law guardian for one of the woman’s children. Strong circumstantial evidence suggested that Elmann had given some or all of the $5,000 to Simonovsky. And Elmann was later recorded assuring the woman that the money had been received by the defendant, and that “the green makes him love you.” Thus, the essential allegations made by the woman were corroborated by consent recordings and independent investigation.
The defendant nevertheless argues that it was improper to issue an eavesdropping warrant on the basis of recorded statements by Elmann because he was never shown to be a rehable informant. The fact is that Elmann was not an informant at all; he was an apparent conspirator, soliciting bribes and boasting of his ability to influence cases in court. He took $5,000 from the woman upon the representation that it would he used to affect the outcome of her custody case. If his representations were true, he was guilty of bribery; if they were false, he was guilty of grand larceny. In either case, the judge who issued the first warrant for electronic surveillance in the case — surveillance of Elmann’s cell and business phones — had probable cause to believe that Elmann had committed a designated offense and that communications concerning that offense would be obtained through the electronic surveillance.[4]
Subsequent warrants and extensions for Elmann’s telephones and for the cell and office telephones of Simonovsky were based on the results of the eavesdropping and independent investigation. Those results showed among other things that, whether credible or not, Elmann continued to boast to other matrimonial litigants of his supposed relationship with the defendant and his ability to influence cases pending before him. Further evidence was developed of Elmann’s close working relationship with Simonovsky, and with the defendant’s former part clerk. Additionally, investigators established that Simonovsky, who appeared before the defendant, spent an extraordinary amount of time with him outside of court, taking him out for lunches, din *274 ners, and drinks. Clearly, the warrants and extensions were all supported by probable cause.
The defendant strenuously challenges the warrant, issued on December 9, 2002, authorizing video surveillance of his robing room. He contends that there was no probable cause to believe that the defendant had committed or was committing a designated offense, or that observations concerning any such offense could be obtained through video surveillance of the robing room.
The defendant argues that Elmann’s statements about him were transparently false, and seen to be so by the investigators themselves. But even if everything Elmann said about his supposed relationship with the defendant was untrue, there remained substantial evidence that he and Simonovsky were working together on cases, and that Simonovsky was continually buying the defendant meals and drinks, with the purpose of gaining influence over the defendant’s handling of those cases. Thus, for example, on November 18, 2002, in a recorded telephone conversation, Simonovsky reported to his coconspirator Elmann that he had just spent two hours getting the defendant drunk and that “[hje’ll do what we want.”
The defendant points out that Elmann had told the woman that the real deals are made, not in the courtroom, but in the defendant’s chambers. He argues that, because the defendant’s chambers were actually located in a different building, there was no probable cause to believe that video surveillance of the defendant’s robing room would produce observations concerning any designated offense. But all the telephone contact between Elmann and the courthouse originated from the courtroom phone where the robing room was located. It was reasonable therefore for the issuing judge to conclude that Elmann’s reference to the defendant’s chambers was really to his robing room and not to his formal chambers in a different building. I note that great deference is due that determination (cf. Griminger, 71 NY2d at 640), especially since, at the time, the issuing judge was the administrative judge of the court and therefore was presumably aware of the work habits and routines of the judges she supervised.
The two subsequent warrants authorizing video surveillance of the defendant’s robing room were also supported by probable cause. For the first one, aside from the information provided in the application for the earlier robing room warrant, there was now additional evidence that the defendant and Simonovsky *275 were having private discussions concerning a case that was then on trial before the defendant. And Simonovsky was recorded telling another attorney that “it’s a Garson case and I’ll get the benefit.”
The final video surveillance of the defendant’s robing room involved a plan by the District Attorney to capture the payment of a cash “referral fee” by the now-cooperating Simonovsky to the defendant. The purpose of the video surveillance was to corroborate allegations made by the former conspirator, and to gain evidence to support the prosecutors’ theory that “referral fees” were among the benefits accepted by the defendant as bribes. Inasmuch as the payment of cash to the defendant was planned, there was probable cause to believe that it would occur.
In sum, therefore, the eavesdropping and video surveillance warrants were all supported by probable cause.
B. Normal Investigative Procedures
The defendant contends that all eavesdropping and video surveillance evidence obtained after February 24, 2003 must be suppressed because, on that day, Simonovsky became an available cooperating witness and therefore the District Attorney could no longer claim that normal investigative procedures were unlikely to succeed in obtaining the evidence sought.
A warrant authorizing eavesdropping or video surveillance may not be issued unless the application contains “[a] full and complete statement of facts establishing that normal investigative procedures . . . reasonably appear to be unlikely to succeed if tried ... to obtain the evidence sought” (CPL 700.20 [2] [d]). Thus, neither eavesdropping nor video surveillance may be routinely employed as the initial step in a criminal investigation (see United States v Giordano, 416 US 505, 515 [1974]).
That is not to say, however, “that ‘all possible’ investigative techniques must first be exhausted or that electronic surveillance can only be sought as a ‘last resort’ . . . But the issuing judicial officer, who must test the application in a ‘practical and commonsense fashion,’ . . . must be apprised of the nature and the progress of the investigation in order to insure that electronic surveillance is more than a useful tool . . . Mere conclusions of the affiant will not do . . .” (People v Gallina, 95 AD2d 336, 339-340 [2d Dept 1983] [citations omitted]). Moreover, “[t]he reviewing court must test the People’s showing of necessity in a practical and commonsense fashion in the context *276 of the objectives of the investigation” (People v Fonville, 247 AD2d 115, 119 [4th Dept 1998]).
In the case at bar, the planned payment of a “referral fee” could only be done in private, out of sight of anyone other than the defendant and Simonovsky. The District Attorney planned to employ the normal investigative technique of having Simonovsky, who had only recently become a cooperating witness and whose cooperation had yet to be tested, wear a body recorder. But video surveillance was the only way to determine fully how the defendant would react to the offer of money, and what he would do with it after Simonovsky left. I cannot hold that the issuing judge abused her discretion when she determined that a sufficient showing had been made that normal investigative procedures reasonably appeared to be unlikely to succeed in obtaining the evidence sought (see e.g. People v Bavisotto, 120 AD2d 985 [4th Dept 1986], lv denied 68 NY2d 912 [1986]; see also United States v McGuire, 307 F3d 1192, 1196-1197 [9th Cir 2002]).
C. Duration of the Electronic Surveillance
CPL 700.10 (2) provides in pertinent part that “[n]o eavesdropping or video surveillance warrant may authorize or approve the interception of any communication or the conducting of any video surveillance for any period longer than is necessary to achieve the objective of the authorization, or in any event longer than thirty days.” The stated objectives of the authorizations here were:
(a) the identification of coconspirators, accomplices, and agents;
(b) the determination of whether the alleged bribery operation is part of a larger illegal operation; and, if so, determining the scope, structure, and decision-making processes of that operation;
(c) identification of the means by which the bribes are negotiated, arranged and paid;
(d) identification of all cases that may have been affected by the bribery operation; and
(e) the gathering of sufficient evidence for the successful prosecution of the targets.
The defendant argues that, on February 24, 2004, when Simonovsky became a cooperating witness, all the stated objectives were achieved and therefore all electronic surveillance *277 should, have terminated. He maintains that, because it did not, all evidence gathered through electronic surveillance on or after that date must be suppressed.
Although Simonovsky agreed to cooperate on February 24, 2004, the extent of his willingness and the genuineness of his cooperation remained untested. Thus, the District Attorney was not required to conclude immediately that Simonovsky would provide information on the full extent of the conduct under investigation or the identities of all involved. Moreover, the defendant, who adamantly maintains his innocence, is hard-pressed to argue that, with Simonovsky’s decision to cooperate with the District Attorney, prosecutors achieved their stated objective of gathering sufficient evidence for the successful prosecution of the targets.
I hold that the electronic surveillance did not continue for a period longer than was necessary to achieve the objectives stated in the warrants.
IV Discovery
The defendant seeks certain discovery beyond that provided by the People. This and all other discovery disputes are respectfully referred to the trial court.
V Conclusion
Having found that the grand jury evidence fails to establish an essential element of the crime of receiving reward for official misconduct in the second degree, and supports only one of the three counts of official misconduct, I am obliged to dismiss the six counts of receiving reward for official misconduct in the second degree and two of the three counts of official misconduct. The case will therefore proceed to trial on the top count of bribe receiving in the third degree, on one count of official misconduct, and on one count of receiving unlawful gratuities.
Finally, I note that the issues raised with respect to the counts of receiving reward for official misconduct in the second degree appear to be of first impression and are not free from doubt. It has long been settled that, when such close questions of law are presented during trial, courts should generally rule for the People because only the defendant has a right to appeal (see e.g. People v Reed, 276 NY 5, 9 [1937]; People v Coppa, 57 AD2d 189, 191-192 [2d Dept 1977], revd on other grounds 45 NY2d 244 [1978]). By the same token, when close questions of law regarding the viability of charges are presented prior to trial, it *278 may sometimes be wise for the court to resolve them in the defendant’s favor because only the People have a right to an immediate, pretrial appeal (see CPL 450.20 [1]). Thus, if the People here remain convinced of the viability of the counts of receiving reward for official misconduct in the second degree, and continue to be intent on pursuing those charges, they may now test their position on appeal before trial rather than after.
Accordingly, for all of the foregoing reasons, the defendant’s motion should be granted to the extent that the six counts of receiving reward for official misconduct in the second degree and two counts of official misconduct should be dismissed. All discovery disputes should be referred to the trial court. In all other respects, the defendant’s motion should be denied.

. That section contains rules that largely parallel the canons found in the Code of Judicial Conduct adopted by the New York State Bar Association.

. As set forth in 22 NYCRR 100.3 (B) (6), the exceptions are:
“(a) Ex parte communications that are made for scheduling or administrative purposes and that do not affect a substantial right of any party are authorized, provided the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and the judge, insofar as practical and appropriate, makes provision for prompt notification of other parties or their lawyers of the substance of the ex parte communication and allows an opportunity to respond.
“(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and a copy of such advice if the advice is given in writing and the substance of the advice if it is given orally, and affords the parties reasonable opportunity to respond.
“(c) A judge may consult with court personnel whose function is to aid the judge in carrying out the judge’s adjudicative responsibilities or with other judges.
“(d) A judge, with the consent of the parties, may confer separately with the parties and their lawyers on agreed-upon matters.
*265 “(e) A judge may initiate or consider any ex parte communications when authorized by law to do so.”

. The defendant’s alternative argument that the evidence must be suppressed because the People never procured a valid indictment charging a designated offense fails with the rejection of his challenge to the grand jury proceeding that resulted in the second indictment. That indictment included a charge of bribe receiving in the third degree which is a designated offense (see CPL 700.05 [8] [f]).

. Both bribery and grand larceny are designated offenses (see CPL 700.05 m, [b]>.