UNITED STATES of America,
Plaintiff–Appellant,

v.

Jesus CANALES GOMEZ,
aka Pops, Defendant,

and

Guadalupe Diane Fregoso, aka Diane Fregoso Guadalupe; Magdaleno Gutierrez, aka Tocayo and Magdaleno Gutierrez Mendoza; Alan D. Madrid, aka Gabacho, Defendants–Appellees.

No. 03–50106.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 2004.

Filed March 2, 2004.

---

Michael J. Raphael, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellant.

Timothy C. Lannen, Los Angeles, California, for defendant-appellee Diane Guadalupe Fregoso.

David M. Dudley, Los Angeles, California, for defendant-appellee Alan Madrid.

Dominic Cantalupo, Santa Monica, California, for defendant-appellee Magdaleno Gutierrez.

Before FRIEDMAN,[*] TROTT, and RAWLINSON, Circuit Judges.

TROTT, Circuit Judge.

The United States appeals from the district court's order suppressing evidence obtained from court-authorized wiretaps. The wiretaps were requested by the FBI in connection with its investigation of a large drug-trafficking operation, and then yielded information that eventually led to the indictments of Defendants–Appellees Diane Fregoso, Alan Madrid, and Magdaleno Mendoza (collectively "Appellees") and 26 other co-defendants.[1] The district court suppressed the wiretap-procured evidence, finding that the application for the wiretap failed to include a full and complete statement of the government's need for the use of the wiretap and, that given the apparent availability of confidential informants, the wiretaps were not necessary. We respectfully disagree and reverse.

## BACKGROUND

On August 4, 2000, the FBI submitted to district court Judge Christina A. Snyder an application pursuant to 18 U.S.C. § 2518 for an order authorizing a wiretap. The application was supported by a thirty-eight page affidavit by FBI Special Agent Robert Strickland ("affidavit"). The wiretaps were requested as part of the FBI's ongoing investigation of a broad scale drug-trafficking organization allegedly led by co-defendants Jesus Gomez and Frank Lial.

After reviewing the application, Judge Snyder authorized a wiretap for the phones of Lial and Gomez, finding that the application had made a sufficient showing of the need for it because normal investigative procedures had been tried and had failed, were reasonably unlikely to succeed, or were too dangerous. On September 6, 2000, after the submission of another FBI affidavit, the court extended the length of the wiretaps for an additional thirty days. Additional wiretaps were authorized by the court, the tenth and final of which was authorized on January 12, 2001.

Appellees, along with their 26 co-defendants, were indicted on August 28, 2001 in the Central District of California on various conspiracy, cocaine, and methamphetamine charges arising out of their involvement with the drug organization. Recordings from the wiretaps of the wireless phones used by Gomez and Lial, procured pursuant to Judge Snyder's authorization, provided much of the evidence supporting the indictments of the Appellees and their co-defendants. On August 26, 2002, Fregoso filed a motion, which Madrid and Mendoza each joined, to suppress the wiretap evidence. On February 20, 2003, Judge Takasugi granted the suppression motion as to Appellees and

---

* Hon. Daniel M. Friedman, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

1. The indictment in this case brought drug and conspiracy charges against 29 members of a drug organization allegedly run by co-defendants Jesus Gomez and Frank Lial. This appeal concerns only Fregoso, Madrid, and Mendoza, as the other defendants did not file timely declarations to establish standing for the suppression motions.

ordered the wiretap evidence against them suppressed, finding that the government's application for the wiretap did not comply with the necessity requirement of 18 U.S.C. § 2518(1)(c) and (3)(c). The court concluded that the government had sufficiently utilized pen registers and physical surveillance in an attempt to ferret out the full scope of the conspiracy and to develop admissible and convincing evidence thereof, but that those methods had not been altogether fruitful and successful. However, the court concluded also that "the government did not sufficiently use confidential informants or provide a full and complete statement explaining why they would not suffice." The district court focused on three previously-used confidential informants, and concluded that in light of their prior success dealing with some members of the narcotics organization, the affidavit did not adequately explain why they could not have been further used. The court waived off as "boiler plate" many of the affiant's averments regarding the limitations of the use of these and other informants.

## ANALYSIS

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518, prohibits electronic surveillance by the federal government except under specific circumstances. In a request for a court-authorized wiretap, the government must provide an application that includes, inter alia, "a full and complete statement as to whether or not other investigative procedures have been tried and have failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

### A. Full and Complete Statement of Facts

■ We review de novo whether the information submitted in an affiant's affidavit amounts to "a full and complete

statement of the facts" as required by 18 U.S.C. § 2518(1)(c). *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

We have reviewed Agent Strickland's 38-page affidavit and conclude with no hesitation that it constitutes a full and complete statement of the facts as required by the statute. The affidavit, prepared by a federal agent with nine years experience, 5-1/2 with the FBI and 3-1/2 with the DEA, detailed how normal investigative procedures had been tried and failed, and why those procedures were reasonably unlikely to succeed in this investigation in the future. Indeed, the affidavit relayed in great detail how the investigators had used, or contemplated using, each of the following traditional techniques: confidential informants, physical surveillance, pen registers, trap and trace devices, telephone toll analysis, search warrants, interviews, grand jury subpoenas, trash searches, consensual recordings, police reports and arrest records, financial investigations, and mail cover requests. The affidavit detailed why each of these techniques would be unsuccessful at identifying the full scope of the massive conspiracy under investigation, and allowing the government "to obtain direct evidence that will convince a jury beyond a reasonable doubt of" its existence. Specifically, the investigation sought to reveal the key personnel of the narcotic trafficking conspiracy, the identity of the main customers of the identified conspiracy, the stash locations where cocaine was stored prior to distribution, and the management and disposition of financial proceeds generated by the organization's cocaine trafficking. Though traditional methods had unearthed some preliminary information regarding these matters, without the wiretaps, the investigators could not penetrate the inner workings of the drug conspiracy or "obtain information about the extended organiza-

tion, such as other members, couriers, buyers and suppliers." *United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir.2000). The affidavit adequately explained that the interception of wire communications was the *only* way to identify and investigate the whole of the network, including the entire hierarchy of suppliers, transporters, distributors, customers, and money launderers.

The district court, however, found that the affidavit lacked an adequate explanation regarding the use of confidential informants. Specifically, the district court found that because the confidential informants' previous interactions with members of the organization had provided much of the investigation's preliminary information, it was unclear why the continued use of these informants would be unsuccessful. We disagree.

With respect to the previous successful dealing performed by three FBI informants, termed FBI–I, FBI–2, and FBI–3, the affidavit explained that they would be unlikely to secure information on the entire network. As the affidavit explained, the three informants were in custody in Cleveland, Ohio, their custodial status had already hindered their ability to function as consistent informants, and they were no longer in contact with members of the organization. Any temporary release would have been fruitless, as no long-term buyer/ seller relationship could have been developed under these circumstances; and any attempt by the informants to re-contact the organization would have been suspicious and dangerous. Moreover, these informants had been denied access to suppliers and customers and were unaware of relevant trafficking locations or the scope of the full conspiracy. In addition, informants would have been unable to provide timely, comprehensive information regarding the current trafficking operations. This explanation is sufficient. Indeed, we

have previously acknowledged the limitations of individual informants in such broad investigations and often upheld government requests for such wiretaps when large-scale organizations are under investigation. *See, e.g., id.* at 1121 n. 3 ("We have consistently upheld similar wiretap applications seeking to discover major buyers, suppliers, and conspiracy members"). The informants' previous success is inapposite. "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." *Id.* at 1122.

Finally, the Appellees reliance on *Blackmon* is misplaced. In *Blackmon*, we suppressed wiretap evidence because the wiretap application "contain[ed] material omissions and misstatements" that, when purged, left a deficient application. 273 F.3d at 1211. No such misstatements are alleged in this case.

In fine, we conclude that the affidavit provided Judge Snyder with a full and complete statement of the facts.

### B. Necessity Requirement

■ The issuing judge's decision that the wiretap was necessary is reviewed under an abuse of discretion standard. *United States v. McGuire*, 307 F.3d 1192, 1197 (9th Cir.2002). We have "adopted a 'common sense approach' in which the reviewing court uses a standard of reasonableness to evaluate the government's good faith effort to use alternative investigative means or its failure to do so because of danger or low probability of success." *Blackmon*, 273 F.3d at 1207 (quoting *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir.1985)). Though "the wiretap should not ordinarily be the initial step in the investigation, . . . law enforcement officials need not exhaust every conceivable

alternative before obtaining a wiretap." *McGuire,* 307 F.3d at 1196–97.

In this case, the affidavit explained—as we have already discussed—that FBI agents targeting the operations of Gomez and Lial had attempted to use several different investigative techniques during the conspiracy investigation. The wiretap application contained specific facts chronicling the progress of the FBI investigation and detailed the reasons supporting their conclusion that other investigative techniques had exhausted their usefulness or seemed unlikely to lead to information supporting a conviction. *United States v. Brone,* 792 F.2d 1504, 1506 (9th Cir.1986) (explaining that government can show wiretap's necessity in light of its need to "develop an effective case"); *see also McGuire,* 307 F.3d at 1198–99 (explaining that "effective case" is defined as "evidence of guilt beyond a reasonable doubt"). The district court concluded, however, that the government did not make a sufficient showing of necessity because confidential informants had been used successfully in the past and could have, in the district court's view, provided the necessary information on the organization's drug-trafficking activities. As we suggested in the previous section of this opinion, we respectfully disagree.

■ Agent Strickland's affidavit explained in detail why in light of the broad goals of the investigation the continued use of informants was unlikely to result in the necessary information. The government need not show that informants would be useless in order to secure a court-authorized wiretap. *United States v. Shryock,* 342 F.3d 948, 976 (9th Cir.2003) (holding that necessity existed despite the existence of informants because infiltration by informants could not determine the scope of conspiracy); *McGuire,* 307 F.3d at 1199 ("Not only common sense but also our precedent confirms that the existence of

informants and undercover agents does not preclude a necessity finding."). The government explained that investigators sought to identify the key personnel, suppliers, customers, and drug-locations of a large narcotic network, and confidential informants, monitored during individual drug transactions, could only have aided in the arrests of a limited number of those involved. This court " 'consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to the apprehension and prosecution of . . . other satellite conspirators.' " *Id.* at 1198 (quoting *United States v. Torres,* 908 F.2d 1417, 1422 (9th Cir. 1990)).

Investigations of criminal conspiracies present unique law enforcement problems and "pose a greater threat to society than individual action toward the same end." *Id.* at 1197. Accordingly, any previous success from the use of confidential informants is even less persuasive in the context of an investigation of criminal conspiracy. *See id.* at 1198 (concluding that "government is entitled to more leeway in its investigation methods when it pursues a conspiracy"). In this case, not only were confidential informants unlikely to provide the needed information, but the informants on which the district court focused were incarcerated on other charges in another state. We do not believe that the necessity requirement mandates that the government organize the release of jailed informants before a wiretap will be authorized. Indeed, we have previously explained that "[t]he use of informants to investigate and prosecute persons engaged in clandestine criminal activity is fraught with peril." *United States v. Bernal–Obeso,* 989 F.2d 331, 333 (9th Cir.1993).

■ We have stressed repeatedly that informants as a class, although indispens-

able to law enforcement, are oftentimes untrustworthy. *See, e.g., Commonwealth v. Bowie*, 243 F.3d 1109, 1124 (9th Cir. 2001) ("[A]lthough the truthful testimony of accomplice witnesses will continue to be of great value to the law, rewarded criminals also represent a great threat to the mission of the criminal justice system."). This concept is true whether investigators are looking for drugs or weapons of mass destruction. On occasion, informants mislead investigators and prosecutors in order to feather their own nests. *See id.* at 1117. Indeed, juries in federal cases are routinely instructed that the testimony of witnesses receiving anything from the government in return for the witness's cooperation must be examined "with greater caution than that of other witnesses." Ninth Cir.Crim. Jury Instr. 4.9 (2003). There is not a trial lawyer alive who does not understand that juries are wary of any witness receiving a benefit for testifying. Here, the government is to be commended for its interest in wiretap evidence, which, compared to the word of an informant either in the field or in court, is the gold standard when it comes to trustworthy evidence. The truth-seeking function of our courts is greatly enhanced when the evidence used is not tainted by its immediate informant source and has been cleansed of the baggage that always comes with them. Moreover, wiretap evidence out of the mouths of defendants is valuable corroboration of informant testimony. Such evidence serves also to ensure that what investigators are being told by informants is accurate, a very valuable function that guards against the indictment of the innocent. Indeed, the Supreme Court has opined that a jury may understandably be unfavorably impressed with evidence of the "police's uncritical readiness to accept the story and suggestions of an informant whose accounts were inconsistent...." *Kyles v. Whitley*, 514 U.S. 419, 453, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Thus, we conclude that a reasoned review of a wiretap request must take into account the added difficulty, expense, and danger of using informants, especially those concurrently charged with other crimes, and in custody in another jurisdiction.

In sum, Agent Strickland's affidavit more than adequately as well as convincingly detailed why, using his professional judgment and in his experienced opinion, traditional investigative techniques would not suffice and the continued use of confidential informants would not meet the goals of the investigation. While the district court was not persuaded by the reasons given, there is no question as to the completeness of the affidavit as required by § 2518(1)(c). We are unable to discern anything missing from the affiant's affidavit, and we see nothing in it that justifies the district court's characterization of any part of it as "boiler plate." A judicially-imposed requirement that the government attempt to use all potential informants before securing a wiretap would be impractical and contrary to investigatory experience and the force of our precedent. The government need not prove that informants would be totally useless. Accordingly, we find that the government has manifestly met its burden of showing the necessity of the wiretaps, and Judge Snyder's order so holding was not in clear error.

## CONCLUSION

The government's application for an order authorizing a wiretap of Gomez and Lial's telephones included a full and complete statement regarding the necessity of the wiretap, and the issuing court appropriately exercised its discretion in finding that the necessity requirement had been met. Accordingly, the district court's order suppressing the wiretap evidence is hereby REVERSED and the case is re-

manded to the district court for further proceedings.