**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA
            *Plaintiff-Appellee,*

            v.

ARMANDO GARCIA-VILLALBA,
            *Defendant-Appellant.*

No. 05-30506
D.C. CR-04-00301-012-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
July 6, 2009—Seattle, Washington

Filed November 2, 2009

Before: Diarmuid F. O'Scannlain, Andrew J. Kleinfeld, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge O'Scannlain

14745

**COUNSEL**

Brooks Holland, Gonzaga University School of Law, Spo-kane, Washington, argued the cause for the defendant-appellant and filed the briefs.

Michael S. Morgan, Assistant United States Attorney, Seattle, Washington, argued the cause for the plaintiff-appellee and filed the brief. Jeffrey C. Sullivan, United States Attorney, was on the brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We venture into the world of organized crime to evaluate the legality of a wiretap and a search of a stash house for illegal drugs.

I

A

This case is about a wiretap that led to the takedown of a sophisticated drug-trafficking organization. Run by members of the Garcia-Villalba family, the drug ring operated in rural Washington. Couriers made drug runs by car to Arizona, where they picked up narcotics that had been smuggled into the United States from Mexico. The vehicles contained secret "stash compartments" designed to ferry the drugs back to Washington undetected. There, the couriers were met by higher-ups in the organization, who unloaded and distributed the drugs. Armando Garcia-Villalba ("Armando") was one such distributor.

In 2003, the Drug Enforcement Agency ("DEA") began an investigation which Paul Hackett, a Spanish-speaking DEA

agent, spearheaded by going undercover. Using a confidential informant, Hackett managed to get introduced to Alejandro Delgadillo-Uribe, apparently a front-line dealer. Over the following months, Hackett became a reliable customer. He purchased significant quantities of methamphetamine on five separate occasions. Later, he bought heroin and cocaine.

During the business relationship, Hackett obtained Delgadillo-Uribe's cell phone number. That number, and two others allegedly used by Delgadillo-Uribe, became the focus of the investigation. In August 2003, when Hackett had been dealing with Delgadillo for about eight months, a magistrate judge authorized a pen register and trap-and-trace device to be used on all three phone numbers. A pen register and trap-and-trace device are used to record the numbers dialed from a particular telephone number, but do not allow the listener to overhear the contents of the communication. The initial authorization expired in October 2003, but two additional magistrate judges extended it until April 2004.

Using information gleaned from the pen register and trap-and-trace device, Hackett identified several of Delgadillo-Uribe's associates. There, however, the investigation appeared to stall. In March 2004, the DEA sought authorization to wiretap one of Delgadillo-Uribe's phones. In support of the wiretap application, Agent Hackett submitted an affidavit to United States District Judge Robert Lasnik. Hackett's affidavit cited the limits of the information provided by physical and aerial surveillance, the pen register, and confidential informants. The affidavit also explained why alternative investigatory techniques, such as trash searches, search warrants, grand jury subpoenas, and interviews, were rejected as impractical. Judge Lasnik granted the application and authorized the wiretap, which we will refer to as the "TCT1" wiretap.

The TCT1 wiretap, which was in effect for two months, intercepted over 2,700 calls. As the investigation continued to

unfold, the DEA sought and obtained another wiretap on a phone allegedly used by a man named Anthony Tanguma (the "TCT2" wiretap). After a confidential informant linked Delgadillo-Uribe to another man named Andres Ayon-Corrales, the DEA sought and obtained a third wiretap (the "TCT3" wiretap) on a cell phone allegedly used by Ayon-Corrales. The toll records for Ayon-Corrales' phones, in turn, revealed a fourth cell phone that was connected to Cecilio Garcia-Villalba ("Cecilio"), a brother of the defendant in this case.

Sensing they were about to break the conspiracy wide open, the DEA sought authorization for a fourth wiretap on Cecilio's phone (the "TCT4" wiretap). In support of the TCT4 application, Hackett submitted another affidavit, spanning thirty-one pages, which described the status of the investigation and explained the need for a wiretap. The district court approved the TCT4 wiretap, which generated information linking Armando to narcotics trafficking. The legality of the TCT4 wiretap is the central issue in this appeal.

Based on information obtained from the four wiretaps, Agent Hackett sought a warrant to search four separate structures that he believed were being used as stash houses. One of the four structures was a residence located on Dunbar Road in Mount Vernon, Washington. Hackett's affidavit in support of the warrant application alleged that the Dunbar Road residence, called the "choza," was a key "stash house" for narcotics and money. A magistrate judge concluded that the affidavit established probable cause that narcotics would be found at the Dunbar Road residence and signed the warrant.

Agents executed the search warrants in July 2004. Inside the "choza," they came upon a safe containing heroin, cocaine, and methamphetamine. Agents also found digital and gram scales, sandwich bags, magazines for firearms, ammunition, drug ledgers, wire transfer receipts, bills, and receipts.

Following the searches, agents arrested members of the Garcia-Villalba organization, including Armando.

B

A grand jury in the Western District of Washington indicted Armando on forty-six counts. He was charged with conspiracy to distribute methamphetamine, heroin and cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. He was also charged with possession of heroin, cocaine and methamphetamine with intent to distribute (21 U.S.C. § 841(a)(1), (b)(1)(A)), use of a communication facility to facilitate a drug offense (21 U.S.C. § 843(b)), and distribution of cocaine.

Prior to trial, Armando moved to suppress the evidence obtained from the TCT4 wiretap and the contraband recovered from the Dunbar Road residence. After an evidentiary hearing, the district court denied the motion to suppress the wiretap evidence. It also concluded that the search of the "choza" was not supported by probable cause, but nevertheless denied the motion to suppress because the officers relied in good faith on the search warrant. After a jury trial, Armando was convicted and sentenced to the mandatory minimum of 120 months in prison followed by five years of supervised release.

Armando's original appellate counsel filed an *Anders* brief, asserting that no meritorious issues were presented on appeal. Counsel also moved to withdraw. A motions panel of our court granted the motion to withdraw, but struck the *Anders* brief, identified arguable issues, and appointed new counsel. Armando's new appellate counsel filed this timely appeal.[1]

---

[1]We have disposed of issues regarding the district court's denial of Jesus Garcia-Villalba's motion to suppress in a separate memorandum disposition filed concurrently with this opinion.

II

On appeal, Armando takes no issue with anything that occurred during the trial. Rather, he challenges the denial of his pretrial motions to suppress. In particular, he claims that the government did not adequately demonstrate necessity for the wiretap. He also insists that the search of the Dunbar Road residence was not supported by probable cause and that the officers did not rely in good faith on the magistrate's approval of the warrant. We address these contentions in turn.

A

**[1]** Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520, allows law enforcement agencies to conduct electronic surveillance of suspected criminal activities. This authority is not a blank check; aside from demonstrating probable cause, *see* 18 U.S.C. § 2518(3)(a), "the government must prove necessity" before it resorts to a wiretap. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1110 (9th Cir. 2005). "The purpose of the necessity requirement is to ensure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988).

To this end, a wiretap application must contain, among other things, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The judge may grant the application if he determines, among other requirements, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c).

**[2]** We have held "that the wiretap should not ordinarily be the initial step in the investigation, but that law enforcement

officials need not exhaust every conceivable alternative before obtaining a wiretap." *United States v. McGuire*, 307 F.3d 1192, 1196-97 (9th Cir. 2002) (footnote omitted). The necessity requirement "can be satisfied by a showing in the application that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." *Id.* at 1196. "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006) (internal quotation marks and citation omitted). An "effective case" means "evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." *McGuire*, 307 F.3d at 1198 (internal quotation marks omitted).

Our review takes place in two related steps. First, we must "review de novo whether the application for wiretapping was submitted in compliance with 18 U.S.C. § 2518(1)(c)," and then must review "the issuing court's decision that the wiretaps were necessary for an abuse of discretion." *Id.* at 1197. "When reviewing necessity we employ a 'common sense' approach to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." *Gonzalez, Inc.*, 412 F.3d at 1112.

1

**[3]** We begin by evaluating whether the affidavit contains "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

**[4]** After reviewing Hackett's thirty-one page affidavit, we are persuaded that it does contain such a statement. According

to the affidavit, the DEA used a pen register and trap-and-trace device on Cecilio's cell phone (the subject of the later TCT4 wiretap) for sixty days, and analyzed two months' worth of toll records. These methods revealed substantial numbers of calls between Cecilio's cell phone and known drug traffickers but, as the affidavit explains, did not reveal the subject-matter of those conversations. Although we are aware that "the use of pen registers alone is insufficient to establish necessity for a wiretap," *Gonzalez, Inc.*, 412 F.3d at 1113, the government's extensive use of other forms of electronic surveillance prior to seeking a wiretap weighs heavily in its favor.

**[5]** Hackett's affidavit describes efforts to conduct physical surveillance on individuals identified through calls listed on Cecilio's cell phone. Attempts to follow Cecilio had been unsuccessful due to difficulties in locating him and the rural, open location of his residence. The affidavit additionally reports that "[o]n several occasions, law enforcement agents have attempted to find and surveil [Cecilio] by either following Alejandro Delgadillo-Uribe en route to meetings with other sources, or by attempting to decipher coded terminology from intercepted telephone conversations regarding meeting places used by them." According to the affidavit, Delgadillo-Uribe and his associates employed countersurveillance techniques that successfully frustrated these efforts. We have upheld wiretaps in situations, like this one, where the affidavit explains in reasonable, case-specific detail why physical surveillance efforts have been unsuccessful. *See, e.g.*, *United States v. Staves*, 383 F.3d 977, 981-82 (9th Cir. 2004); *United States v. Canales Gomez*, 358 F.3d 1221, 1224-25 (9th Cir. 2004).

**[6]** The affidavit also explains in "case-specific detail," *United States v. Rivera*, 527 F.3d 891, 900 (9th Cir. 2008), why alternative investigatory techniques, such as trash searches, search warrants, subpoenas, arrests of target subjects, and interviews, were rejected. Trash searches at

Cecilio's residence were impractical because the residence "is situated on the side of a hill in a sparsely populated, open rural area with few trees or bushes." Additional search warrants, grand jury subpoenas, arrests, and interviews would "effectively terminate the investigation without achieving the objective of identifying, and obtaining evidence against, other participants." In addition, such tactics could "cause members of both organizations, including [Cecilio], to flee and to destroy evidence." We have approved affidavits containing comparably detailed recitals. *See, e.g.*, *Canales Gomez*, 358 F.3d at 1224 (approving an affidavit from an experienced agent that "relayed in great detail how the investigators had used, or contemplated using . . . confidential informants, physical surveillance, pen registers, trap and trace devices, telephone toll analysis, search warrants, interviews, grand jury subpoenas, trash searches, consensual recordings, police reports and arrest records, financial investigations, and mail cover requests").[2]

[7] The affidavit also details, again in a case-specific manner, why the use of confidential informants, used successfully on individuals associated with the earlier wiretaps, would not work with Cecilio. The affidavit reports: "Since the [earlier wiretaps], no confidential informants have been developed who can penetrate the Garcia organization. I was not intro-

---

[2]Armando criticizes the government's physical surveillance efforts, asserting that "[m]any viable options existed for effective surveillance of Cecilio, even at his residence." He suggests that the government should have affixed a camera to a telephone pole near Cecilio's residence, as it had done during its surveillance of the Dunbar Road residence. Armando cites grand jury testimony demonstrating that such a technique would have been feasible.

We are not persuaded that the affidavit should have included a discussion of such a technique. Our precedent does not require an affidavit to discuss and to dismiss all possible forms of physical surveillance. *See, e.g.*, *Staves*, 383 F.3d at 982 ("Law enforcement officials need not exhaust every conceivable investigative technique before seeking a wiretap order.").

duced to any of Alejandro Delgadillo-Uribe's sources of supply . . . nor have I been introduced to many of the distributors." In addition, the affidavit points out that Delgadillo-Uribe had been arrested and was not cooperating, closing off a previously valuable source of intelligence, while associates of Delgadillo-Uribe who had also been arrested "were lower-level violators who did not have contact with Alejandro Delgadillo-Uribe's sources of supply, such as [Cecilio]."

Armando criticizes these explanations as "fleeting and passive," arguing that the affidavit failed meaningfully to explain why confidential informants could not be used to infiltrate the Garcia-Villalba organization. We disagree. Though, as always, more information could have been included, we are persuaded that Hackett's affidavit contains "reasonable detail" and is sufficiently case-specific to pass muster under our precedent. Indeed, in *Rivera*, we rejected an argument strikingly similar to the one that Armando now urges us to adopt:

> Defendants contend that the affidavit should have provided more detail, such as *why* a confidential source was considered to be in too much danger, *why* other confidential sources were unwilling or too scared to infiltrate the Rivera organization, and *why* the government chose to deport a confidential source and a source of information. *However, we have not required such a level of detail in a wiretap application.*

*Rivera*, 527 F.3d at 899 (emphasis added). Like the affidavit at issue in *Rivera*, "the affidavit here did more than recite the inherent limitations of using confidential informants; it explained in reasonable detail why each confidential source or source of information was unable or unlikely to succeed in achieving the goals of the . . . investigation." *Id.*

[8] We recognize that some language in the affidavit may be conclusory or merely describe the inherent limitations of

certain investigatory techniques, but this is not decisive. *See United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990) ("The presence of conclusory language in the affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity."); *see also United States v. Fernandez*, 388 F.3d 1199, 1237 (9th Cir. 2004). The affidavit as a whole speaks in case-specific language, and we are persuaded that it contains "a full and complete statement as to whether or not investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

2

**[9]** Satisfied that Hackett's affidavit is sufficiently detailed, we turn to whether the issuing judge abused his discretion in finding that the TCT4 wiretap was necessary. Employing "a 'common sense' approach," we must "evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." *Gonzalez, Inc.*, 412 F.3d at 1112.

Our decision in *McGuire* guides us. There, FBI agents sought to wiretap phones used by the "Montana Freemen," a group of vigilantes bent on taking down the United States government. *McGuire*, 307 F.3d at 1195. In upholding the wiretap, we emphasized that "the government is entitled to more leeway in its investigative methods when it pursues a conspiracy." *Id.* at 1198. "Like the Hydra of Greek mythology," we reasoned, "the conspiracy may survive the destruction of its parts unless the conspiracy is completely destroyed." *Id.* at 1197-98. Noting that "[i]t is one of the first duties of every government to extirpate gangs of thieves," *id.* at 1198 n.3 (quoting 4 Thomas Babington Macaulay, *History of England*

205 (1855)), we upheld the district court's approval of the wiretap application.

Here, Agent Hackett, working undercover, was introduced only to a front-line dealer, not to the leaders behind the scenes. Without a wiretap designed to unveil the leaders, the DEA may have been limited to a street level war, cutting off one head of the Hydra only to watch another grow to replace it. Sophisticated drug conspiracies often rely on separation and limited contact between street level dealers and higher-ups, meaning that traditional investigative techniques some-times cannot end the threat that such organizations pose to public safety. A wiretap, which targets communications, is well-suited to unmasking the leaders of a narcotics-trafficking organization.[3]

Indeed, the characteristics of the Garcia-Villalba organiza-tion created particular difficulties for DEA investigators. As in *McGuire*, "agents could not have conducted on-site surveil-lance" of the organization's property "because of its remote, rural location." *Id.* at 1197. DEA agents lurking about Cecilio's residence would have raised suspicions and possibly sabotaged the investigation. In addition, "[f]ederal agents would have had difficulty infiltrating the group" because "of the [Garcia-Villalba organization]'s close-knit nature." *Id.* These problems made a wiretap particularly appropriate in this situation.

[10] Our precedent confirms this conclusion. In *Torres*, we upheld a necessity finding because: "1) continued surveillance was not feasible due to appellants' use of countersurveillance; 2) the use of a search warrant or grand jury proceeding would alert appellants of an ongoing investigation; 3) informants and

---

[3]We need not and do not suggest that investigation of a drug conspiracy necessarily justifies a wiretap. The rules must be applied to the facts in each case with an individualized judgment to be made by the judicial offi-cer to whom the proposed warrant is presented.

undercover agents could not determine the source of [the] drugs." *Torres*, 908 F.2d at 1422. Similarly, here, Hackett's affidavit detailed the difficulties of continued physical surveillance, the problems with alerting the defendants to the investigation by serving search warrants or grand jury subpoenas, and the government's desire to identify the "role of all participants in [the] offenses."

*Gonzalez, Inc.*, in which we upheld a district court's finding that the government had not shown necessity, does not require a contrary conclusion. There, before applying for a wiretap, the government had used: "(1) five-days-worth of pen register analysis; (2) an equally short use of trap-and-trace analysis; and (3) limited physical surveillance of the Blake Avenue office." *Gonzalez, Inc.*, 412 F.3d at 1112. Here, by contrast, the government used pen register and trap and trace data for months, not days. In addition, the government conducted significantly more extensive physical surveillance.

**[11]** For these reasons, the district court did not abuse its discretion in finding that the wiretap was necessary.

3

Before concluding our discussion of the wiretap, we pause to address Armando's general objection to the affidavit: that it improperly employed a "cascading theory of necessity." According to Armando, "with each wiretap order obtained and employed successfully during the investigation, the need for the next wiretap more and more was presumed and other investigative methods more and more were discounted as inconvenient or inefficient." Armando asserts that by "the time of the application for a wiretap on TCT4, the allegations of necessity had become largely conclusory statements that improperly attempted to fold the showing of necessity to wiretap TCT1 into the application to wiretap TCT4."

**[12]** Because our precedent is not clear on what constitutes a "cascading theory of necessity," we take this opportunity to

clarify our law. Armando is correct that "the government is not free to transfer a statutory showing of necessity from one application to another—even within the same investigation." *Gonzalez*, *Inc.*, 412 F.3d at 1115. We have "held that an issuing judge may not examine various wiretap applications together when deciding whether a new application meets the statutory necessity requirement." *Id.* Rather, "[e]ach wiretap application must separately satisfy the necessity requirement." *Id.*

[13] This does not mean, however, that a district court must view a wiretap application in a vacuum. Although the government may not rely on the conclusion that a previous wiretap was necessary to justify the current application, historical facts from previous applications, particularly those within the same investigation, will almost always be relevant. So will previous investigatory tactics, so long as they bear on whether the government has adequately shown necessity within the current application. If these facts are incorporated into the latest affidavit, the issuing judge may examine them. For example, the government may rely on past failed attempts to infiltrate an organization, detailed in past affidavits, as evidence that future attempts would be fruitless. Nothing in our precedent prohibits an affidavit from employing such a technique, which is designed merely to save time, not to piggyback an earlier showing of necessity into a later affidavit. The key question will always be whether the wiretap application separately satisfies the necessity requirement.

[14] Here, the TCT4 application separately satisfied the requirement. The government used the pen register and trap-and-trace device on Cecilio's cell phone, not merely on the cell phones associated with the prior wiretaps. In addition, the affidavit details efforts to surveil Cecilio himself, not merely unconnected individuals associated with earlier wiretaps. These TCT4-specific facts distinguish this case from *Carneiro*, 861 F.2d at 1180-81, where we invalidated a wiretap "because the later applications did not show that particular-

ized investigative actions were targeted, without success, at each later suspect." *Gonzalez, Inc.*, 412 F.3d at 1115 (describing the factual basis for *Carneiro*'s holding). Indeed, Hackett's affidavit's references to earlier investigative efforts, as the government points out, largely incorporate "by reference the historical facts described in earlier affidavits to the issuing judge."

**[15]** Accordingly, the district court properly denied Armando's motion to suppress the evidence obtained from the TCT4 wiretap.[4]

## B

Satisfied that the district court did not abuse its discretion in approving the government's wiretap application, we turn to Armando's argument that the district court should have suppressed the evidence obtained from the search of the Dunbar Road residence. The district court concluded that the government did not have probable cause to search the residence. It

---

[4]In a pro se opening brief filed before the appointment of new appellate counsel, Armando challenges his 120-month sentence. According to Armando, "because the jury convicted him of a conspiracy with multiple possible objects, but without specifying which of those multiple objects [Armando] was guilty of conspiracy to commit, the district court erred by not sentencing [Armando] based on the charged object carrying the lightest maximum statutory penalty." Armando thinks that the "charged object carrying the lightest maximum statutory penalty" was the use of "communication facilit[ies to] facilitat[e] the commission of" a drug offense," which carries a statutory maximum of forty-eight months. 21 U.S.C. §§ 843(b), (d)(1).

We are unpersuaded. Armando was not charged with conspiracy to use a communications facility; he was charged with a conspiracy to distribute drugs. In other words, the use of a communications facility was not the *object* of the conspiracy; it was an *overt act* committed in furtherance of the conspiracy, the object of which, of course, was to distribute controlled substances. The jury specifically found that Armando conspired to distribute narcotics in sufficient quantities to require imposition of the statutory minimum of 120 months.

nevertheless refused to suppress the evidence because it thought that the "good faith" exception applied. On appeal, the government challenges the first determination; Armando attacks the second.

The government argues that the district court erred by finding no probable cause to believe that contraband would be found at the Dunbar Road residence.[5] In the government's view, Agent Hackett's affidavit in support of the search warrant adequately connected narcotics trafficking to the "choza" at Dunbar Road.

**[16]** The Fourth Amendment requires that all warrants be supported by probable cause. U.S. Const. amend. IV. "Probable cause means only a 'fair probability,' not certainty, and requires consideration of the totality of the circumstances." *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006) (internal citation omitted). Accordingly, the question here is whether Agent Hackett's affidavit established a "fair probability" that the choza was being used as a stash house.

Significantly, a magistrate judge initially found in favor of the government on this issue and granted the requested warrant. Only later, on review, did the district judge reverse the magistrate's initial finding. Our precedent requires us to decide, however, whether the *magistrate judge* who granted the warrant, not the district judge who decided the suppression motion, "clear[ly] err[ed]" in finding probable cause. *Id.* Thus, we must "review the magistrate's conclusion that probable cause existed to issue an arrest warrant independently without deferring to the district court's contrary conclusion." *Castillo*, 866 F.2d at 1076; *see also Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) ("[T]he duty of a reviewing court is sim-

---

[5]Although the government did not file a cross-appeal, we may nonetheless consider its argument that probable cause existed. *See United States v. Castillo*, 866 F.2d 1071, 1076 n.2 (9th Cir. 1988) ("[A]n appellee may rely on any argument asserted below in support of the judgment.").

ply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." (internal citation omitted)).

We discern no clear error in the magistrate judge's conclusion. Hackett's affidavit begins by listing Hackett's professional experience and his personal experience with the investigation. It also asserts that "[p]ersons involved in drug trafficking conceal in their residences and businesses caches of drugs." Then, the affidavit spends ten pages discussing the information obtained through electronic surveillance. Paragraph (15) of the affidavit, on which the government primarily relies, reads as follows:

> The DEA also has determined that [Cecilio, Armando], and Octaviano Armenta-Aceves use [the] Dunbar Road, Mount Vernon, Washington [residence], as a "stash house" or storage location for narcotics and or money for the organization. This location, known as the "choza" or shack, has been referred to by the organization's members on numerous intercepted telephone calls, often after [Cecilio] receives an order for controlled substances. Surveillance units have followed vehicles of organization members travel from their residences to the "choza" immediately after [Cecilio] gave an order to deliver a controlled substance to a customer. Further, the subscriber of . . . the telephone at the "choza," is Thomas Summers, a member of the drug trafficking organization.

Other sections of the affidavit describe phone calls mentioning the "choza." The district court, in contrast to the magistrate judge, found these assertions "conclusory." According to the district court, the affidavit was insufficient "to link this residence with the drug activity."

Given the deference that we and the district court owe to the magistrate judge who issued the warrant, the district court

erred in finding that the government did not show probable cause. To be sure, some assertions in the affidavit plainly are conclusory, particularly the one that reads: "The DEA also has determined that [Cecilio, Armando], and Octaviano Armenta-Aceves use 17900 Dunbar Road, Mount Vernon, Washington, as a 'stash house' or storage location for narcotics and or money for the organization." The rest of the paragraph, however, fills in missing details. The affidavit asserts that intercepted telephone calls expressly referred to the "choza" as the location where they met and where they went to bring and to pick up drugs; that surveillance units followed organization members to 17900 Dunbar Road immediately after the wiretap picked up impending news of a transaction; and that the telephone number at 17900 Dunbar Road belonged to Thomas Summers, a member of the organization.

[17] These assertions establish a substantial basis for the magistrate judge's conclusion. In its affidavit, the government represented that DEA agents *actually saw* members of the organization frequent 17900 Dunbar Road immediately after hearing news on the wiretap of an impending drug transaction. When read together with the rest of the affidavit, which contains extensive information about multiple narcotics transactions involving those same members of the organization, these assertions establish a "fair probability," if not a certainty, that 17900 Dunbar Road was used to store drugs. After all, confirmed drug traffickers traveled to 17900 Dunbar Road shortly after the commencement of a sale. From those facts, it is reasonable to infer that the location was used to store drugs immediately before or after a sale.

We have found a "sufficient nexus" between drug dealing activities and a defendant's residence in similar situations. *See, e.g.*, *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (upholding a finding of probable cause to search the defendant's residence when the affidavit detailed many sales of cocaine involving the defendant, but did not show that any of the sales were consummated at the residence); *United*

*States v. Hollis*, 490 F.3d 1149, 1153 (9th Cir. 2007) (upholding a search when "the affidavit rested primarily on the police officers' own observation of the controlled drug transaction between Hollis and the witness and the surveillance of Hollis's subsequent movements, which led to the North Hoyt apartment"); *Fernandez*, 388 F.3d at 1254 ("Agent Spencer's statements about the likelihood that the Rambler residence contained contraband or evidence relevant to the crimes charged, which were based on his own professional experience of the Mexican Mafia, combined with the information from the wiretaps, were sufficient to give the magistrate judge a substantial basis to conclude that the items sought were at the residence.").

[18] Because we are convinced that the district court erred in finding that the warrant was not supported by probable cause, we do not address whether the agents relied on the warrant in good faith. Accordingly, we are satisfied that the district court properly denied Armando's motion to suppress, although we base our conclusion on different grounds.[6]

## III

For the foregoing reasons, the district court's orders denying Armando's motions to suppress are

**AFFIRMED**.

---

[6]Because we believe that probable cause exists, we do not reach the government's argument that Armando lacked standing to challenge the search. We may bypass this issue, which is not jurisdictional. *See United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (holding that the term "standing" as "used in Fourth Amendment jurisprudence . . . does not present a jurisdictional question").